## CODISPOTI ET AL. v. PENNSYLVANIA

No. 73–5615.   Argued March 25, 1974—Decided June 26, 1974

*John J. Dean* argued the cause for petitioners.   With him on the brief was *George H. Ross.*

*Robert L. Eberhardt* argued the cause for respondent *pro hac vice*. With him on the brief was *Robert W. Duggan*.

Mr. JUSTICE WHITE delivered the opinion of the Court.*

In December 1966, petitioners Dominick Codispoti and Herbert Langnes were codefendants with Richard Mayberry in a criminal trial ending in a verdict of guilty. Each acted as his own counsel, although legal advice was available from appointed counsel. At the conclusion of the trial, the judge pronounced Mayberry guilty of 11 contempts committed during trial and sentenced him to one to two years for each contempt. Codispoti was given like sentences for each of seven separate contempts. Langnes was sentenced to one to two years on each of six separate citations. Mayberry's total sentence was thus 11 to 22 years, Codispoti's seven to 14 years, and Langnes' six to 12 years. The contempt convictions were affirmed by the Pennsylvania Supreme Court. This Court granted Mayberry's petition for certiorari, 397 U. S. 1020, and vacated the judgment of the Pennsylvania court, directing that "on remand another judge, not bearing the sting of these slanderous remarks and having the impersonal authority of the law, [sit] in judgment on the conduct of petitioner as shown by the record." *Mayberry* v. *Pennsylvania*, 400 U. S. 455, 466 (1971).

The contempt charges against Mayberry and petitioners were then retried in separate proceedings before another trial judge.[1] Codispoti's demand for a jury was

---

*Part II of the opinion is joined only by MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and MR. JUSTICE POWELL.

[1] The seven contempts charged against Codispoti were:

"1. That while being tried by a jury before Albert A. Fiok, J. on November 18, 1966, he, the defendant, accused the court of

denied. He also moved to subpoena witnesses "to prove that my actions did not disrupt the proceedings, and I intend to prove that my actions [*sic*] was not contemptuous, that it was merely an answer to the provocation made by the presiding Judge." App. 47. This motion was also denied, the court remarking that "this is an issue between the Court and you, and the record will speak for the Court, and you and counsel can speak for yourself." *Ibid.*

---

trying to protect the prison authorities by saying, 'Are you trying to protect the prison authorities, Your Honor? Is that your reason?'

"2. That while on trial as aforesaid on November 29, 1966, he, the defendant, accused the court of kowtowing and railroading the defendant into life imprisonment by saying '. . . it is only because the defendants in this case will not sit still and be kowtowed and be railroaded into a life imprisonment.'

"3. That while on trial as aforesaid on November 30, 1966, he, the defendant, called the judge 'Caesar' and accused the court of misconduct by saying, 'You're trying to railroad us.' and '. . . I have never come across such a tyrannical display of corruption in my life.'

"4. That while on trial as aforesaid on December 1, 1966, he, the defendant, addressed the Court in an insolent and derogatory manner by saying, 'Are you going to tell me my codefendant is not crazy? You must be crazy to try me with him.'

"5. That while on trial as aforesaid on December 2, 1966, he, the defendant, accused the Court of criminal conspiracy between it and prison officials by saying, 'I further intend to prove there is a conspiracy between the prison authorities and this Court.'

"6. That while on trial as aforesaid on December 8, 1966, he, the defendant, created a despicable scene and refused to continue with the calling of his witnesses unless the Court ordered a mistrial, and in general creating an uproar, such an uproar as to cause the termination of the trial.

"7. That while on trial as aforesaid on December 9, 1966, he, the defendant, by constant and boisterous and insolent conduct interrupted the Court in its attempts to charge the jury, thereby creating an atmosphere of utter confusion and chaos." App. 33–34.

The trial then proceeded, the State offering into evidence the relevant portions of the transcript of the 1966 criminal proceedings in the course of which the alleged contempts occurred. The State then rested. Codispoti neither testified nor called witnesses. The court found that he had committed the seven contemptuous acts as charged and sentenced him to six months in prison for each of six contempts and a term of three months for another, all of these sentences to run consecutively.

Petitioner Langnes' trial followed a very similar course.[2]  He was found guilty of six separate contempts

---

[2] The six contempts charged against Langnes were:

"1. That while being tried by a jury before Albert A. Fiok, J. on November 28, 1966, he, the defendant, accused the court of conspiracy by saying, 'For the record, before he begins again, I want the record to show this is another proof of conspiracy between this Court and institution.'

"2. That while on trial as aforesaid on November 29, 1966, he, the defendant, threatened to blow the trial judge's head off, by saying, 'If I have to blow your head off, that's exactly what I'll do. I don't give a damn if its on the record or not. If I got to use force, I will. That's what the hell I'm going to do.'

"3. That while on trial as aforesaid on December 1, 1966, he, the defendant, accused and threatened the court by saying, 'Like I told you, you force this trial on me—you going to give me an illegal trial, I told you before what I was going to do to you, and I mean it. Now I refuse to go on with this trial if you are going to railroad me and badger my witnesses, force me to an unfair trial, that is exactly what I am going to do, punk. I'm going to blow your head off. You understand that?'

"4. That while on trial as aforesaid on December 5, 1966, he, the defendant, told the court to 'Go to hell.' and accused the court of misconduct by saying, 'One reason, you obviously have gotten in contact with the local papers to sharpen the hatchet over the heads of the defendants accusing them of causing the taxpayers fifty grand which as a result gave this hearing a prejudicial atmosphere. I would like to state here for the record, and for the papers, if need be, it is not us that is costing the taxpayers money. It is you, Mr.

and sentenced to five terms of six months each and one term of two months, all to be served consecutively.

The trial court filed an opinion stating that "the only points at issue are the validity of the sentences. The question of guilt of contemptuous conduct has been confirmed by both the Supreme Court of Pennsylvania . . . and by the U. S. Supreme Court . . . , therefore testimony at this hearing was limited to the record." App. 35. The court also held that petitioners were not entitled to a jury trial

> "because the questions of guilt to which the juries' decisions would be limited had already been adjudicated adversely to the Defendants by two appellate courts. Furthermore, in the instant cases no term of imprisonment in excess of six months was imposed for any one offense. The offenses for which sentences were imposed occurred at different times and on different dates." *Id.*, at 36 (footnote omitted).

Maroney, and the Commonwealth that is costing the taxpayers money.'

"5. That while on trial as aforesaid on December 5, 1966, he, the defendant, made scurrilous remarks to the court by saying, 'For the record, I would like to state that as far as my personal opinion is concerned, communist Russia, communist China, and Cuba need men like you. I think wherever you came from you infiltrated the courts and the whole place might as well be communist Russia.'

"6. That while on trial as aforesaid on December 9, 1966, he, the defendant, threatened the life of the court by saying, 'I object to what you did to my two codefendants and I swear on my mother's name that I will keep my promise to you, the two threats I made. Don't worry about me interrupting during your summation. I won't even dignify these stinking proceedings, punk, go to hell, and I will shake hands in hell with you. I will be damned to you.' Also, he, the defendant, said, 'You are a dead man, stone dead. Your Honor.'" App. 30–31.

The Pennsylvania Supreme Court affirmed without opinion, one justice dissenting on the ground that petitioners were entitled to a jury trial. 453 Pa. 619, 306 A. 2d 294. We granted certiorari limited to those questions raising the issue whether petitioners should have been afforded a jury trial. 414 U. S. 1063 (1973).[3]

## I

In *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), the Court held that the Fourteenth Amendment guaranteed to defendants in state criminal trials the right to jury trial provided in the Sixth Amendment. In a companion case, *Bloom* v. *Illinois,* 391 U. S. 194 (1968), the Court held that while petty contempts, like other petty crimes, could be tried without a jury, serious criminal contempts had to be tried with a jury if the defendant insisted on this mode of trial. Although the judgment about the seriousness of the crime is normally heavily influenced by the penalty authorized by the legislature, the Court held that where no legislative penalty is specified and sentence is left to the discretion of the judge, as is often true in the case of criminal contempt, the pettiness or seriousness of the contempt will be judged by the penalty actually imposed. Finally, the Court recognized that sentences up to six months could be imposed for criminal

---

[3] The questions on which certiorari was granted were stated in the petition, as follows:

"1. Should petitioners receive cumulative sentences for contempt of court imposed at the end of a trial where the total effective sentence received must be used rather than the individual sentences in order to determine the seriousness of the contempt and thereby determine whether the accused should be afforded the right to a jury trial?

"2. Should the strong possibility of a substantial term of imprisonment require that an accused be afforded the right to a jury trial?"

contempt without guilt or innocence being determined by a jury, but a conviction for criminal contempt in a non-jury trial could not be sustained where the penalty imposed was 24 months in prison.

Since that time, our decisions have established a fixed dividing line between petty and serious offenses: those crimes carrying a sentence of more than six months are serious crimes and those carrying a sentence of six months or less are petty crimes. *Frank* v. *United States,* 395 U. S. 147, 149–150 (1969); *Baldwin* v. *New York,* 399 U. S. 66, 69 (1970).[4] Under these cases, we plainly cannot accept petitioners' argument that a contemnor is entitled to a jury trial simply because a strong possibility exists that he will face a substantial term of imprisonment upon conviction, regardless of the punishment actually imposed. See *Taylor* v. *Hayes, ante,* p. 488. Our cases, however, do not expressly address petitioners' remaining argument that they were entitled to jury trials because the prison sentences imposed after posttrial convictions for contemptuous acts during trial were to be served con-

---

[4] In tracing the lineage of the six-month dividing line for purposes of ascertaining whether a jury trial is required under the Sixth Amendment, MR. JUSTICE REHNQUIST's dissent implicitly questions the authenticity of this rule. Putting aside whether the "constitutional rule of *Bloom*" ever "evolved" into the present rule, it is sufficient to note that although only three Members of the Court explicitly embraced the six-month demarcation point in *Baldwin* v. *New York,* 399 U. S. 66 (1970), Mr. Justice Black and MR. JUSTICE DOUGLAS concurred in the judgment. While reading the Sixth Amendment to require a jury trial for "all crimes," they expressed the view that imprisonment for more than six months would certainly necessitate a jury trial. Five Members of the Court out of the eight participating therefore agreed that, at the very least, the Sixth Amendment requires a jury trial in all criminal prosecutions where the term of imprisonment authorized by statute exceeds six months.

secutively and, although each was no more than six months, aggregated more than six months in jail.[5]

## II

There are recurring situations where the trial judge, to maintain order in the courtroom and the integrity of the trial process in the face of an "actual obstruction of justice," *In re McConnell*, 370 U. S. 230, 236 (1962) ; see also *In re Little*, 404 U. S. 553, 555 (1972), convicts and sentences the accused or the attorneys for either side for various acts of contempt as they occur.

---

[5] My Brother REHNQUIST submits that petitioners are not entitled to a jury trial because they were originally tried and convicted of contempt in 1966, two years before this Court's decisions in *Duncan* v. *Louisiana*, 391 U. S. 145 (1968), and *Bloom* v. *Illinois*, 391 U. S. 194 (1968), which we held in *DeStefano* v. *Woods*, 392 U. S. 631 (1968), should receive only prospective application. His dissent finds further support for its conclusion in *Jenkins* v. *Delaware*, 395 U. S. 213 (1969), where the Court held that *Miranda* v. *Arizona*, 384 U. S. 436 (1966), did not apply to persons whose retrials had commenced after the date of the *Miranda* decision if their original trials had begun before that date. This view, however, represents a fundamental misreading of the reach of these decisions and their applicability to the peculiar circumstances of this case. *DeStefano* unmistakably stated that "we will not reverse state convictions *for failure to grant jury trial where trials began* prior to May 20, 1968, the date of this Court's decisions in *Duncan* v. *Louisiana* and *Bloom* v. *Illinois*." 392 U. S., at 635 (emphasis added). *DeStefano* did not exempt from the jury-trial requirement trials beginning after that date, and here petitioners' convictions occurred in a trial that began over three and one-half years after the *Duncan* and *Bloom* decisions. The boundaries for the retroactive impact of *Duncan* and *Bloom* were advisedly established, for the jury-trial requirement, by definition, relates to *trials*, not to uncorrectable police conduct which occurred prior to trial and which, if illegal, would preclude the use of perhaps critical evidence gathered in reliance on then-existing law. *Jenkins* v. *Delaware* involved the latter considerations and has little bearing here.

Undoubtedly, where the necessity of circumstances warrants, a contemnor may be summarily tried for an act of contempt during trial and punished by a term of no more than six months. Nor does the judge exhaust his power to convict and punish summarily whenever the punishment imposed for separate contemptuous acts during trial exceeds six months. Cf. *United States* v. *Seale,* 461 F. 2d 345, 355 (CA7 1972).

*Bloom* v. *Illinois, supra,* recognized, as cases in this Court have consistently done, "the need to maintain order and a deliberative atmosphere in the courtroom. The power of a judge to quell disturbance cannot attend upon the impaneling of a jury." 391 U. S., at 210.

> "[A] criminal trial, in the constitutional sense, cannot take place where the courtroom is a bedlam . . . . A courtroom is a hallowed place where trials must proceed with dignity . . . ." *Illinois* v. *Allen,* 397 U. S. 337, 351 (1970) (separate opinion of DOUGLAS, J.).

See also N. Dorsen & L. Friedman, Disorder in the Court: Report of the Association of the Bar of the City of New York, Special Committee on Courtroom Conduct 10–23 (1973); Burger, The Necessity for Civility, 52 F. R. D. 211, 214–215 (1971).

> "To allow the disruptive activities of a defendant . . . to prevent his trial is to allow him to profit from his own wrong. The Constitution would protect none of us if it prevented the courts from acting to preserve the very processes that the Constitution itself prescribes." *Illinois* v. *Allen, supra,* at 350 (BRENNAN, J., concurring).

More recently, in *Mayberry* v. *Pennsylvania, supra,* we again noted that a judge, when faced with the kind of conduct there at issue, "could, with propriety, have

instantly acted, holding petitioner in contempt . . . ." 400 U. S., at 463. That the total punishment meted out during trial exceeds six months in jail or prison would not invalidate any of the convictions or sentences, for each contempt has been dealt with as a discrete and separate matter at a different point during the trial.

## III

When the trial judge, however, postpones until after trial the final conviction and punishment of the accused or his lawyer for several or many acts of contempt committed during the trial, there is no overriding necessity for instant action to preserve order and no justification for dispensing with the ordinary rudiments of due process. *Mayberry* v. *Pennsylvania, supra,* at 463–464; *Groppi* v. *Leslie,* 404 U. S. 496, 499–507 (1972); *Taylor* v. *Hayes, ante,* at 497. Moreover, it is normally the trial judge who, in retrospect, determines which and how many acts of contempt the citation will cover. It is also he or, as is the case here, another judge who will determine guilt or innocence absent a jury, who will impose the sentences and who will determine whether they will run consecutively or concurrently. In the context of the post-verdict adjudication of various acts of contempt, it appears to us that there is posed the very likelihood of arbitrary action that the requirement of jury trial was intended to avoid or alleviate. Cf. *ibid.*

The jury-trial guarantee reflects "a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government." *Duncan* v. *Louisiana,* 391 U. S., at 155 (footnote omitted). The Sixth Amendment represents a "deep commitment of the Nation to the right of

jury trial in serious criminal cases as a defense against arbitrary law enforcement . . . ." *Id.*, at 156. Moreover,

"criminal contempt is a crime in every fundamental respect . . . . [I]n terms of those considerations which make the right to jury trial fundamental in criminal cases, there is no substantial difference between serious contempts and other serious crimes. Indeed, in contempt cases an even more compelling argument can be made for providing a right to jury trial as a protection against the arbitrary exercise of official power. Contemptuous conduct, though a public wrong, often strikes at the most vulnerable and human qualities of a judge's temperament. Even when the contempt is not a direct insult to the court or the judge, it frequently represents a rejection of judicial authority, or an interference with the judicial process or with the duties of officers of the court." *Bloom* v. *Illinois*, 391 U. S., at 201–202.

In the case before us, the original trial judge filed the contempt charges against these petitioners, while another judge tried them and imposed the sentences. Because the latter had the power to impose consecutive sentences, as he did here, guilt or innocence on the individual charges bore heavily on the ultimate sentence and was of critical importance. Here the contempts against each petitioner were tried seriatim in one proceeding, and the trial judge not only imposed a separate sentence for each contempt but also determined that the individual sentences were to run consecutively rather than concurrently, a ruling which necessarily extended the prison term to be served beyond that allowable for a petty criminal offense. As a result of this single proceeding, Codispoti was sentenced to three years and three months for his seven contemptuous acts, Langnes to two years and eight

months for his six contempts. In terms of the sentence imposed, which was obviously several times more than six months, each contemnor was tried for what was equivalent to a serious offense and was entitled to a jury trial.

We find unavailing respondent's contrary argument that petitioners' contempts were separate offenses and that, because no more than a six months' sentence was imposed for any single offense, each contempt was necessarily a petty offense triable without a jury. Notwithstanding respondent's characterization of the proceeding, the salient fact remains that the contempts arose from a single trial, were charged by a single judge, and were tried in a single proceeding. The individual sentences imposed were then aggregated, one sentence taking account of the others and not beginning until the immediately preceding sentence had expired.

Neither are we impressed with the contention that today's decision will provoke trial judges to punish summarily during trial rather than awaiting a calmer, more studied proceeding after trial and deliberating "in the cool reflection of subsequent events." *Yates* v. *United States,* 355 U. S. 66, 76 (1957) (footnote omitted). Summary convictions during trial that are unwarranted by the facts will not be invulnerable to appellate review. Cf. *Sacher* v. *United States,* 343 U. S. 1, 9, 13 (1952).[6]

Nor can we accept the trial court's view that the question of petitioners' guilt on the contempt charges had already been conclusively adjudicated in this Court. Our decision in *Mayberry* v. *Pennsylvania, supra,* although expressing strong condemnation of Mayberry's conduct,

---

[6] "When constitutional rights turn on the resolution of a factual dispute we are duty bound to make an independent examination of the evidence in the record. See, *e. g., Edwards* v. *South Carolina,* 372 U. S. 229, 235; *Blackburn* v. *Alabama,* 361 U. S. 199, 205, n. 5." *Brookhart* v. *Janis,* 384 U. S. 1, 4 n. 4 (1966).

which we reaffirm, did not purport to affirm Mayberry's contempt conviction. On the contrary, the judgment affirming the conviction was vacated and a new trial required before a different judge who was to sit "in judgment on the conduct of petitioner as shown by the record." 400 U. S., at 466.

The judgment of the Pennsylvania Supreme Court is reversed and the case remanded for further proceedings not inconsistent with this opinion.

*So ordered*

MR. JUSTICE MARSHALL, concurring in part.

I concur in the judgment of the Court, and in Parts I and III of the Court's opinion. However, I cannot join Part II of the opinion, which suggests that the trial judge in a situation such as we have here could impose an unlimited number of separate, consecutive six-month sentences upon a defendant "for separate contemptuous acts during trial," so long as the judge convicts and punishes summarily upon the occurrence of each contemptuous act. In my view, the Sixth Amendment right to jury trial would be equally applicable to this situation.

I

The Court's opinion observes that "[t]he Sixth Amendment represents a 'deep commitment of the Nation to the right of jury trial in serious criminal cases as a defense against arbitrary law enforcement.'" *Ante*, at 515–516, quoting *Duncan* v. *Louisiana*, 391 U. S. 145, 156 (1968). The opinion further recognizes that it is the trial judge who in a single proceeding acts as prosecutor, "determin[ing] which and how many acts of contempt the citation will cover"; as trier of fact, "determin[ing] guilt or innocence absent a jury"; and as judge, "impos[ing] the sentences and . . . determin[ing] whether they will run con-

secutively or concurrently." *Ante,* at 515. Thus, the Court concludes, "there is posed the very likelihood of arbitrary action that the requirement of jury trial was intended to avoid or alleviate." *Ibid.* I agree. But I completely fail to see how there is any less likelihood of such arbitrary action by a judge when he acts summarily to punish each allegedly contemptuous act by a defendant as it occurs, rather than awaiting the end of trial to try the contempts. Indeed, the suggestion provides an incentive for a trial judge to act in the heat of the moment, and thus encourages the very arbitrary action which it is the purpose of the Sixth Amendment to eliminate.

We have held that a six-month sentence is the constitutional dividing line between serious offenses for which trial by jury must be afforded and petty offenses, and that in contempt cases it is the sentence actually imposed rather than the penalty authorized by law which is determinative. Accordingly, the Court today holds that Codispoti and Langnes are constitutionally entitled to a jury trial because "[i]n terms of the sentence imposed, which was obviously several times more than six months, each contemnor was tried for what was equivalent to a serious offense." *Ante,* at 517. The Court rejects the State's argument that the individual contempts were separate offenses for Sixth Amendment purposes by pointing out that the contempts arose from a single trial, that they were charged by a single judge, and that the individual sentences were then aggregated. With all due respect, the same would be true if the judge had imposed summary punishment as the contemptuous acts occurred. Where the contemptuous acts arose out of a single course of conduct by the defendant, I think that they should be treated as a single serious offense for which the Sixth Amendment requires a jury trial, whether the judge seeks

to use his summary contempt power in individual instances during trial or tries the contempts together at the end of trial. See N. Dorsen & L. Friedman, Disorder in the Court: Report of the Association of the Bar of the City of New York, Special Committee on Courtroom Conduct 222–224 (1973).

The only justification advanced by the Court to support the contrary position is the "overriding necessity for instant action to preserve order." *Ante,* at 515. But we rejected this very argument in *Bloom* v. *Illinois,* 391 U. S. 194, 209–210 (1968). There, too, it was suggested that an exception to the constitutional rule requiring jury trial in serious contempt cases should be made for contempts committed in the presence of the judge because of "the need to maintain order and a deliberative atmosphere in the courtroom." Although we acknowledged that there was a "strong temptation" to do so, we held that the need to maintain order was not sufficient to justify an exception to the constitutional requirement.

## II

Equally important, I am convinced that there is no "overriding necessity" for repeated use of the summary contempt power against a criminal defendant to maintain order in the courtroom. No clearer statement of the problem of courtroom disorder and its solution can be found than Mr. Justice Black's statement in *Illinois* v. *Allen,* 397 U. S. 337, 343–344 (1970):

"It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly

> defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly."

The Court in *Allen* set out three alternative ways of dealing with courtroom disorder. Today my Brothers single out one of these three alternatives and sanction the use of seriatim judge-imposed six-month sentences to maintain order and a deliberative atmosphere in the courtroom because of the necessity for this remedy. There is nothing in *Allen,* however, that approves a succession of judge-imposed six-month contempt citations in one trial, and I have been unable to find any of our cases giving such specific authorization. This is too big a step to take where such a positive declaration of law is not necessary for the decision of the case at hand.

The availability of the other remedies set forth in *Allen* is persuasive proof that courtroom disorder can be effectively dealt with without the use of repeated summary contempts resulting in lengthy jail terms. See N. Dorsen & L. Friedman, *supra,* at 235. Indeed, repeated contempt citations are probably the least effective way to deal with the problem. The very fact that a series of contempt citations has failed to check the defendant's contemptuous acts and restore a deliberative atmosphere in the courtroom itself demonstrates that another citation is unlikely to do so. Either of the other two alternatives set forth in *Allen* would correct rather than prolong the disruptions of an orderly trial. Rather than permit the

use of repeated contempt citations resulting in a sentence of over six months, *Allen* suggests that after an initial warning, see 397 U. S., at 350 (BRENNAN, J., concurring), the next disruption could be punished with a contempt citation and a six-month sentence, plus a firm warning that any further disruption will be followed by binding or gagging the defendant or removing him from the courtroom until he promises to conduct himself properly. This approach would be more effective in maintaining that "dignity, order, and decorum" of which Mr. Justice Black spoke in *Allen* than successive contempt citations after future disruptions, without running afoul of the Sixth Amendment's right to jury trial.

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE, MR. JUSTICE STEWART, and MR. JUSTICE REHNQUIST join, dissenting.

In *Bloom* v. *Illinois,* 391 U. S. 194 (1968), this Court established a constitutional right to a jury trial of a charge for a criminal contempt where the penalty imposed exceeded six months. There the contempt consisted of a lawyer's filing a spurious will for probate. It was not a direct contempt in open court. Where, as in *Bloom,* the criminal contempt takes place outside the presence of the court, there is little to distinguish the contempt, for purposes of using a jury as the factfinder, from the run-of-the-mill criminal offense. In this respect, the result in *Bloom* was a logical one.

In the present case, however, the contempt took place in open court and the incident and all its details are fully preserved on the trial record. The Court's opinion does not specify and leaves unclear what facts, if any, remain to be determined. I am at a loss, therefore, to see the role a jury is to perform. The perceived need to remove

the case from the contemned judge is fully served by assigning the case to a different judge. See *Taylor* v. *Hayes, ante,* p. 488; *Mayberry* v. *Pennsylvania,* 400 U. S. 455 (1971). And, as MR. JUSTICE REHNQUIST points out, since the new judge, not the jury, will impose the sentence, there is nothing the jury can do by way of mitigating an excessive punishment.

The determination of whether basically undisputed facts constitute a direct criminal contempt is a particularly inappropriate task for the jury. Before today, this determination has always been the exclusive province of the court, not the jury, and never before has this Court required a jury trial in a case involving a direct contempt.* Since I believe, as a practical matter, that there is no function for a jury to serve in a case such as this, I do not join the Court's extension of *Bloom* to include direct, in-court contempts. I, therefore, respectfully dissent.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins as to Part II, dissenting.†

These two cases are graphic illustrations of the manner in which constitutional limitations on the power of a trial judge to summarily punish for contempt have been fashioned virtually out of whole cloth by this Court in

---

*In *Bloom* v. *Illinois,* 391 U. S. 194, 210 (1968), the Court acknowledged "a strong temptation to make exception to the rule we establish today for disorders in the courtroom." Although wholly unnecessary to its decision, the Court there resisted that temptation and declined to recognize the exception. In my opinion, the result in *Bloom,* an out-of-court contempt, does not lead inevitably to the result reached today in Codispoti's case, and I decline to follow *Bloom*'s dictum that carries the contrary implication.

†[This opinion applies also to No. 73–473, *Taylor* v. *Hayes, ante,* p. 488.]

the course of only 20-odd years. In *Sacher* v. *United States*, 343 U. S. 1 (1952), the Court, speaking through Mr. Justice Jackson, said:

> "Summary punishment always, and rightly, is regarded with disfavor and, if imposed in passion or pettiness, brings discredit to a court as certainly as the conduct it penalizes. But the very practical reasons which have led every system of law to vest a contempt power in one who presides over judicial proceedings also are the reasons which account for it being made summary. . . . The rights and immunities of accused persons would be exposed to serious and obvious abuse if the trial bench did not possess and frequently exert power to curb prejudicial and excessive zeal of prosecutors. The interests of society in the preservation of courtroom control by the judges are no more to be frustrated through unchecked improprieties by defenders." *Id.*, at 8.

The Court's decisions today are the culmination of a recent trend of constitutional innovation which virtually emasculates this historic power of a trial judge. If the Court's holdings in this area were the product of any new historical insight into the meaning of the Fourteenth Amendment, or if indeed they could be regarded as a desirable progression toward a reign of light and law, even though of dubious constitutional ancestry, there would be less occasion for concern. But from the hodge-podge of legal doctrine embodied in these decisions, which have irretrievably blended together constitutional guarantees of jury trial in criminal cases, constitutional guarantees of impartial judges, and fragments of the law of contempt in federal courts, the only consistent thread which emerges is this Court's inveterate propensity to second-guess the trial judge.

# I

In *Taylor* v. *Hayes, ante,* p. 488, the Court holds, squarely contrary to the holding in *Sacher, supra,* that the respondent trial judge was not entitled to proceed summarily against petitioner, even though all of the conduct in question occurred in the presence of respondent. The Court apparently concludes that since respondent did not sentence petitioner until after the proceedings at issue were completed, and at that point refused to permit petitioner to respond, petitioner's due process rights were violated.

This conclusion is completely at odds with *Sacher.* That case involved the contempt convictions of various defense counsel as an aftermath of the trial of various Communist Party leaders on charges of violating the Smith Act. Upon receiving the guilty verdict, Judge Medina of the Southern District of New York at once filed a certificate under Fed. Rule Crim. Proc. 42 (a), finding various defense counsel, including one defendant who had represented himself, guilty of contempt. Federal Rule Crim. Proc. 42 (a) provided then, as it does now, that "[a] criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record." The contemnors argued that since Judge Medina had waited until the end of the trial to sentence them, the power of summary punishment for direct contempts under Rule 42 (a) had expired, and the provisions of Rule 42 (b) requiring notice and hearing became applicable. This Court in *Sacher* rejected that contention:

> "The Rule in question contemplates that occasions may arise when the trial judge must immediately

arrest any conduct of such nature that its continuance would break up a trial, so it gives him power to do so summarily. But the petitioners here contend that the Rule not only permits but requires its instant exercise, so that once the emergency has been survived punishment may no longer be summary but can only be administered by the alternative method allowed by Rule 42 (b). We think 'summary' as used in this Rule does not refer to the timing of the action with reference to the offense but refers to a procedure which dispenses with the formality, delay and digression that would result from the issuance of process, service of complaint and answer, holding hearings, taking evidence, listening to arguments, awaiting briefs, submission of findings, and all that goes with a conventional court trial. The purpose of that procedure is to inform the court of events not within its own knowledge. The Rule allows summary procedure only as to offenses within the knowledge of the judge because they occurred in his presence.

". . . To summon a lawyer before the bench and pronounce him guilty of contempt is not unlikely to prejudice his client. It might be done out of the presence of the jury, but we have held that a contempt judgment must be public. Only the naive and inexperienced would assume that news of such action will not reach the jurors. If the court were required also then to pronounce sentence, a construction quite as consistent with the text of the Rule as petitioners' present contention, it would add to the prejudice. . . ." 343 U. S., at 9–10.

At no point did the Court in *Sacher* suggest that the procedures set forth in Rule 42 (a) were subject to any constitutional infirmity. Yet by the decision in *Taylor*

v. *Hayes,* the Court has now held that procedures upheld within the unitary confines of the federal court system only two decades ago may not now be constitutionally employed by a State. The decision in *Taylor* will surely come as something of a shock to federal judges who must now decide whether they may constitutionally utilize the provisions of Fed. Rule Crim. Proc. 42 (a) in punishing direct contempts.

Our prior decisions have continuously adhered to the view that "[w]here the contempt is committed directly under the eye or within the view of the court, it may proceed 'upon its own knowledge of the facts, and punish the offender, without further proof, and without issue or trial in any form.' " *In re Savin,* 131 U. S. 267, 277 (1889), quoting *Ex parte Terry,* 128 U. S. 289, 309 (1888). See *Cooke* v. *United States,* 267 U. S. 517, 535 (1925); *Fisher* v. *Pace,* 336 U. S. 155, 159–160 (1949).[1] It is only when the contempt is not a direct one, *i. e.,* observed

---

[1] See also the more than 50 cases cited in *United States* v. *Barnett,* 376 U. S. 681, 694 n. 12 (1964).

The Court in *Ex parte Terry,* 128 U. S. 289 (1888), stated:

"We have seen that it is a settled doctrine in the jurisprudence both of England and of this country, never supposed to be in conflict with the liberty of the citizen, that for direct contempts committed in the face of the court, at least one of superior jurisdiction, the offender may, in its discretion, be instantly apprehended and immediately imprisoned, without trial or issue, and without other proof than its actual knowledge of what occurred; and that, according to an unbroken chain of authorities, reaching back to the earliest times, such power, although arbitrary in its nature and liable to abuse, is absolutely essential to the protection of the courts in the discharge of their functions. Without it, judicial tribunals would be at the mercy of the disorderly and violent, who respect neither the laws enacted for the vindication of public and private rights, nor the officers charged with the duty of administering them." *Id.,* at 313.

See also *Cooke* v. *United States,* 267 U. S., at 534.

by the judge himself, that the power to proceed summarily becomes subject to some qualification. *In re Oliver,* 333 U. S. 257, 274–276 (1948).

*Groppi* v. *Leslie,* 404 U. S. 496 (1972), relied upon by the Court, was a wholly different case from *Taylor.* In *Groppi,* the Assembly of the Wisconsin Legislature passed a resolution citing the petitioner there for contempt of that body, which had allegedly occurred two days previously. This Court reversed that conviction because petitioner had not been afforded adequate notice and hearing. The Court in *Groppi* noted that *Sacher* was a different case because it involved courtroom contempts by lawyers, with repeated warnings by the judge, and an opportunity on their behalf to speak. *Taylor* is no different from *Sacher;* respondent judge repeatedly warned petitioner of his contemptuous conduct, and when he informed petitioner that he was in contempt permitted petitioner an opportunity to speak. Indeed, the Court in *Taylor* indicates that it agrees with the Kentucky Court of Appeals that " '[t]he contempt citations and the sentences coming at the end of the trial were not and could not have been a surprise to Taylor, because upon each occasion and immediately following the charged act of contempt the court informed Taylor that he was at that time in contempt of court.' " *Ante,* at 496–497, quoting 494 S. W. 2d 737, 741–742 (Ky. 1973).

Even were I in agreement with the Court's conclusion that Taylor's contempt conviction should be reversed, I nevertheless could not join in the holding that if petitioner is to be tried again, he may not be tried by respondent. While conceding that petitioner's conduct did not constitute the kind of personal attack on respondent that would prevent the latter from maintaining the calm detachment necessary for fair adjudication, *Mayberry* v. *Pennsylvania,* 400 U. S. 455 (1971), the Court holds that "it appears to us that respondent did become

embroiled in a running controversy with petitioner." *Ante,* at 501. This portion of the Court's holding can only be described as a total repudiation of the principle laid down in *Sacher:*

> "A construction of the Rule is advocated which would deny a judge power summarily to punish a contempt that is personal to himself except, perhaps, at a moment when it is necessary to forestall abortion of the trial. His only recourse, it is said, is to become an accuser or complaining witness in a proceeding before another judge.

> "The Rule itself expresses no such limitation, and the contrary inference is almost inescapable. *It is almost inevitable that any contempt of a court committed in the presence of the judge during a trial will be an offense against his dignity and authority.* At a trial the court is so much the judge and the judge so much the court that the two terms are used interchangeably in countless opinions in this Court and generally in the literature of the law, and contempt of the one is contempt of the other. *It cannot be that summary punishment is only for such minor contempts as leave the judge indifferent and may be evaded by adding hectoring, abusive and defiant conduct toward the judge as an individual. Such an interpretation would nullify, in practice, the power it purports to grant."* 343 U. S., at 11–12 (emphasis added).

The Court in *Sacher* was interpreting the language of Fed. Rule Crim. Proc. 42 (a), and, without the slightest suggestion that there might be constitutional infirmities in such procedures, refused to require retrial of the contemnors there before a different judge. Twelve years later, in a state case, *Ungar* v. *Sarafite,* 376 U. S. 575

(1964), the Court reaffirmed the principles of *Sacher,* in the face of an argument that the Constitution required something different. The Court in *Ungar* indicated that it was "unwilling to bottom a constitutional rule of disqualification solely upon . . . disobedience to court orders and criticism of its rulings during the course of a trial. . . . We cannot assume that judges are so irascible and sensitive that they cannot fairly and impartially deal with resistance to their authority or with highly charged arguments about the soundness of their decisions." *Id.,* at 584.

*Taylor* is not a federal case, where this Court, in the exercise of some perceived wisdom of the appropriate policy to be followed in the administration of justice in the federal courts, see *Offutt* v. *United States,* 348 U. S. 11 (1954); *Cooke* v. *United States,* 267 U. S. 517 (1925), may require retrial before another judge. By holding in *Taylor* that the respondent judge should be disqualified from trying petitioner's contempt, the Court has now adopted the very constitutional rule it disavowed in *Ungar* v. *Sarafite, supra,* and found not even worthy of mention in *Sacher.* In *Mayberry* v. *Pennsylvania, supra,* a case in which the defendant's conduct was so extraordinary that even the Court apparently concedes it affords no precedent for today's decision in *Taylor,* the Court was at pains to state that "[a] judge cannot be driven out of a case." 400 U. S., at 463. Yet the teaching of *Mayberry,* and of today's decision in *Taylor,* is precisely the opposite: a judge *can* be driven out of a case by any counsel sufficiently astute to read the new-found constitutional principles enunciated in these decisions. Whether as a matter of policy the added procedural rights conferred upon contemptuous lawyers are worth the sacrifice of the historic authority of the trial judge to control proceedings in his court may be open to debate,

the total absence of any basis in the Fourteenth Amendment for the result which the Court reaches in *Taylor* v. *Hayes,* is to me clear beyond any doubt. Accordingly, I dissent from the Court's reversal of the conviction in that case.[2]

## II

The *Codispoti* litigation in this Court is worthy of a chapter in Charles Dickens' Bleak House. Codispoti and Langnes were codefendants with the petitioner in *Mayberry* v. *Pennsylvania,* 400 U. S. 455 (1971), on contempt charges in the Pennsylvania courts and were apparently beneficiaries of this Court's judgment of reversal in that case.[3] The Court's concluding language in its opinion in that case was that "on remand another judge, not

---

[2] I agree with the Court's conclusion that Taylor was not entitled to a jury trial on the contempt charges.

[3] These petitioners were originally convicted in 1966 of criminal contempt of a Pennsylvania state court. Their codefendant in those proceedings was Richard Mayberry, who was also convicted of contempt. From the affirmance of those convictions by the Supreme Court of Pennsylvania, 434 Pa. 478, 255 A. 2d 131 (1969), only Mayberry sought review in this Court. In *Mayberry* v. *Pennsylvania,* 400 U. S. 455 (1971), this Court reversed Mayberry's conviction and remanded for retrial before another Pennsylvania state court judge. Though the record in this Court is unclear how it came about, Pennsylvania somehow made both Codispoti and Langnes the beneficiaries of the remand in *Mayberry.* They were thus retried on newly filed charges of criminal contempt, before another judge; they were again convicted, and on subsequent appeal to the appellate courts of Pennsylvania, their convictions were affirmed. It is clear, however, that the reversal of Mayberry's conviction and remand to the Pennsylvania courts for retrial, was not intended by *this* Court to disturb the original convictions of Codispoti and Langnes, nor to award them a retrial in the Pennsylvania courts. Whether or not petitioners here may, without further trial, now be incarcerated pursuant to the sentences imposed in the first contempt trial and affirmed on appeal by the Pennsylvania courts is, presumably, a matter of Pennsylvania law.

bearing the sting of these slanderous remarks and having the impersonal authority of the law [sit] in judgment on the conduct of petitioner as shown by the record." *Id.,* at 466. Pennsylvania carried out this mandate to the letter, and, as the Court points out in its opinion, Codispoti and Langnes were tried before a different judge, and received on retrial substantially more lenient sentences than had been imposed in the first instance. Nonetheless, the Court in its *Codispoti* opinion today, without so much as batting an eye, now decides that these petitioners were entitled to a jury trial. If that were the case, and *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), and *Bloom* v. *Illinois,* 391 U. S. 194 (1968), each decided three years before *Mayberry,* require such a result, it would seem to have been appropriate to so indicate in *Mayberry.*

In holding that *Duncan* and *Bloom* require a jury trial for the petitioners in *Codispoti,* the Court does not sufficiently distinguish the analogous case of *Jenkins* v. *Delaware,* 395 U. S. 213 (1969), which at the very least strongly suggests that petitioners were not entitled to a jury trial upon their retrial for contempt. In *Jenkins,* the petitioner had been convicted in a state court of murder and burglary. During the pendency of his appeal in the Supreme Court of Delaware, this Court decided *Miranda* v. *Arizona,* 384 U. S. 436 (1966), and *Johnson* v. *New Jersey,* 384 U. S. 719 (1966), which held that the decision in *Miranda* "applies only to cases in which the *trial* began after the date of [the *Miranda*] decision . . . ." *Id.,* at 721 (emphasis added). In reversing the petitioner's conviction on various state grounds, the Supreme Court of Delaware also determined, *sua sponte,* that under *Johnson* v. *New Jersey, supra,* a statement obtained from petitioner without fully advising him of his constitutional rights would be admissible at his

retrial. Petitioner was retried and convicted of second-degree murder, and the Supreme Court of Delaware again affirmed. This Court affirmed the conviction, rejecting petitioner's argument that the statement should have been excluded from evidence. We held that the *Miranda* standards do not apply to persons whose *retrials* have commenced after the date of that decision if their original trials had begun before that date.

*Codispoti* is a substantially similar case. Codispoti and Langnes were originally tried and convicted of criminal contempt in 1966. This Court did not decide *Duncan* v. *Louisiana, supra,* and *Bloom* v. *Illinois, supra,* until May 20, 1968. And in *DeStefano* v. *Woods,* 392 U. S. 631 (1968) (*per curiam*), the Court held that the decisions in *Duncan* and *Bloom* would not retroactively apply to "trials [begun] prior to May 20, 1968." *Id.,* at 635. Since the original trial of these petitioners began prior to the date of the decisions in *Duncan* and *Bloom,* under *DeStefano* they would not have been entitled to the benefit of those rulings at their original trials. And *Jenkins* v. *Delaware, supra,* certainly suggests that since petitioners' original trial began prior to the decisons in *Duncan* and *Bloom,* they should not receive the benefit of those cases upon their retrial. The Court's rejoinder is that *Duncan* and *Bloom* are different cases because they involve jury trials instead of "uncorrectable police conduct which occurred prior to trial and which, if illegal, would preclude the use of perhaps critical evidence gathered in reliance on then-existing law." But our decision in *Johnson* v. *New Jersey, supra,* that *Miranda* was to have only prospective application did not turn on when the police conduct at issue occurred, but instead on when the *trial of the defendant* occurred. The Court does not tell us why the retrial rule of *Jenkins* v. *Delaware, supra,* is not equally applicable to the jury-trial requirements

of *Duncan* and *Bloom,* which *DeStefano* says do not govern where the original *trial* began prior to the date of those decisions.

The Court's decision in *Bloom* v. *Illinois, supra,* marked a sharp departure from prior constitutional holdings under the Fourteenth Amendment. Even were it clear that petitioners were entitled to the benefit of *Bloom* on retrial, final acceptance of *Bloom*'s holding as governing *Codispoti* would first warrant examination as to its practical effects. Bloom, an attorney, was charged with contempt of a state court for having filed a spurious will for probate. *Bloom* was a classic case of "indirect contempt," one which occurred outside of the presence of the court, and Bloom was accorded a full trial before the court. Evidence was received tending to show that a third party had engaged Bloom to draw a will after the death of the putative testator; Bloom was convicted of contempt by the court, and was sentenced to two years' imprisonment. Under Illinois law, no maximum punishment was provided for convictions for criminal contempt. This Court, relying on *Duncan* v. *Louisiana, supra,* held that where state law did not provide a maximum punishment for criminal contempt, the Fourteenth Amendment required that the penalty actually imposed on the contemnor be the constitutional indicator of the seriousness of the offense and the right of jury trial defined by *Duncan.* Since *Duncan* held that a prosecution for a crime with a maximum penalty of two years was one for a serious offense within the terms of the Sixth and Fourteenth Amendments, the Court held that Bloom was entitled to a jury trial on the contempt charges.

As the Court's opinion today in *Taylor* v. *Hayes, ante,* at 495–496, makes clear, the constitutional rule of *Bloom* has now evolved into a rule whereby a contemnor must be

afforded a jury trial where either a penalty over six months is authorized by statute or where the penalty actually imposed exceeds six months. Presumably, the case-law support for this conclusion is *Duncan* v. *Louisiana, supra,* and *Baldwin* v. *New York,* 399 U. S. 66 (1970), since we deal here, not with a federal case, where this Court, in the exercise of supervisory authority over the administration of justice in the federal courts, has applied this six-month rule, see *Cheff* v. *Schnackenberg,* 384 U. S. 373 (1966), but with a state case where only the Constitution may dictate such a rule. *Duncan* v. *Louisiana, supra,* was a 7–2 opinion which held that where the crime for which a state court defendant was tried was punishable by a two-year sentence, the Fourteenth Amendment required the application of the Sixth Amendment guarantee of jury trial in serious criminal cases to state prosecutions. Mr. Justice Harlan, in dissent, joined by Mr. Justice Stewart, forcefully argued that there was no indication that the drafters of the Fourteenth Amendment intended to make the Sixth Amendment applicable to the States. See Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights? The Original Understanding, 2 Stan. L. Rev. 5 (1949); Morrison, Does the Fourteenth Amendment Incorporate the Bill of Rights? The Judicial Interpretation, 2 Stan. L. Rev. 140 (1949). *Baldwin* v. *New York, supra,* of course, was a plurality opinion of three Members of this Court, which extended the constitutional jury-trial rule of *Duncan* v. *Louisiana, supra,* to any state criminal offense where the penalty permitted was over six months. Mr. Justice Harlan, Mr. Chief Justice Burger, and Mr. Justice Stewart dissented.

The Court in *Codispoti* woodenly applies this six-month rule to the facts of that case, without any regard to the significant differences between *Codispoti* and

*Bloom,* and without regard to the import of its decision. In applying this six-month rule of dubious constitutional origin to consecutive sentences on counts of six months or less, it appears that the *Baldwin* plurality's proposition that six months is the constitutional *sine qua non* of the jury-trial requirement under the Fourteenth Amendment now commands a majority of this Court almost *sub silentio* by passage of time rather than by force of reason.

Codispoti and Langnes were convicted on their retrial of various separate contemptuous acts and were sentenced for each act to terms of six months or less, with the direction that the sentences be served consecutively. The contemnor in *Bloom* was sentenced to two years for one contemptuous act. Bloom's contempt was an indirect one, and he was entitled under Illinois law to the normal rights of any trial defendant save only the right to a jury trial. By awarding him a constitutional right to a jury trial, this Court in effect required that the fact-finding function be transferred from the judge to a jury. Whether right or wrong as a matter of constitutional law, the holding in *Bloom* was at least intelligible. But the contempts of Codispoti and Langnes were direct, committed in the presence of the trial judge. Upon retrial after our decision in *Mayberry, supra,* the case was tried before another Pennsylvania judge on the basis of the certificate of contempt filed by the judge who had presided at the original criminal trial of Mayberry, Codispoti, and Langnes. It does not appear that either Codispoti or Langnes seriously challenged the factual allegations in the certificate of contempt, and it would seem fair to surmise that this lack of factual dispute is typical of a trial based on a certificate of direct contempt.

The Court's opinion in *Bloom* spoke of the seriousness of an offense for which a sentence of more than six

months was imposed, 391 U. S., at 196–197, and it might be thought from the Court's opinion in *Codispoti* today that the jury was in some way expected to mitigate the harshness of the punishment which could be visited upon a contemnor. But there is no indication whatever in the record before us that Pennsylvania law allocates any role in the sentencing of a criminal defendant to the jury. The jury presumably will hear evidence as to relatively undisputed facts, and if it returns a verdict of guilty a sentence will be imposed by a judge trying the case. If it is the length of sentence which is to be the controlling factor in determining whether a jury trial is to be awarded, and the severity of the possible sentence to be imposed by the judge which provides the constitutional basis for requiring a jury trial, the Court's application of *Bloom* to a direct contempt seems questionable for more than one reason. The guarantee of jury trial accorded to these petitioners in no way limits the sentence which may be imposed by the trial judge in those cases where a guilty verdict is returned by the jury. The Court has succeeded only in requiring Pennsylvania to engraft onto its traditional procedures for adjudicating direct contempts a judicial "fifth wheel" without appreciably furthering the constitutional goals enunciated in *Duncan* v. *Louisiana, supra,* and *Bloom* v. *Illinois, supra.*

The application of *Bloom* to the consecutive sentences imposed for the separate contemptuous acts of Codispoti and Langnes is made even more questionable in light of the concession that the result would be different in other fact situations. It is indicated in the Part II opinion that a contemnor "may be summarily tried for an act of contempt during trial and punished by a term of no more than six months. Nor does the judge exhaust his power to convict and punish summarily whenever the

punishment imposed for separate contemptuous acts during trial exceeds six months." *Ante,* at 514. The upshot of this, of course, is that trial judges are surely to be inclined to adjudicate and punish the contempt during the trial rather than awaiting the end of the trial. The answer that is made to this obvious result of the holding is the adjuration that "[s]ummary convictions during trial that are unwarranted by the facts will not be invulnerable to appellate review." *Ante,* at 517. What this statement portends for the future of the Court's inveterate propensity to second-guess trial judges is, as they say, "anybody's guess."

I dissent from the Court's reversal of the convictions in *Codispoti* v. *Pennsylvania.*