OPINION OF THE COURT
Thomas W. Higgins, Jr., J.
The defendant, Burt Carroll, III, is charged with resisting *590 arrest in violation of Penal Law § 205.30. Prior to certain 1984 Penal Law amendments, this class A misdemeanor was punishable throughout the State by a jail term of up to one year. Now, while retaining its class A misdemeanor status, a conviction for resisting arrest carries a maximum sentence of six months (Penal Law § 70.15). Syracuse has a population in excess of 150,000 and, thus, CPL 340.40 (2) requires that defendant’s guilt or innocence be decided by a Judge, not a jury of his peers. The defendant has asked the court for a dismissal of the charge on various grounds. His challenge alleges that CPL 340.40 (2), as amended in 1984, denies him his right to equal protection of the law and of his constitutional right to a jury trial.
BACKGROUND
In 1984 a package of laws was enacted, known as the Misdemeanor Reclassification Act, which substantially altered New York State’s misdemeanor trial and penalty statutory scheme. Two sentencing categories for class A misdemeanors were created. Defendants convicted of class A misdemeanors specifically reclassified by Penal Law § 70.15 (1) (b) remain subject to a maximum one-year sentence; while those convicted of violating the other class A misdemeanors may only receive a six-month period of incarceration. Simultaneously, CPL 340.40 (2) was amended to complement Penal Law § 70.15 (1) (b) and to "provide that the trial of a misdemeanor information in certain [high density] demographic areas be before a single judge where the maximum authorized term of imprisonment is six months or less.” (People v Hall, 128 Misc 2d 166 [NY City Crim Ct 1985].) The right to a jury trial for all class A misdemeanor offenses remains unchanged in the local criminal courts of those municipalities with a population under 150,000.
THE SIXTH AMENDMENT ISSUE
The Sixth Amendment to the US Constitution, as applied to the individual States through the Fourteenth Amendment, mandates a jury trial for a defendant accused of a "serious crime”. This rule is stated in Duncan v Louisiana (391 US 145 [1968]), which case also "reaffirmed the long-established view that so-called 'petty offenses’ may be tried without a jury.” (Baldwin v New York, 399 US 66, 68.) In Baldwin, the court provided guidance in deciding whether an offense is "petty” or *591 "serious”. The severity of the maximum authorized penalty was found the most relevant of the objective criteria reviewed: more specifically, the court concluded that "no offense can be deemed 'petty’ for purposes of right to trial by jury where imprisonment for more than six months is authorized.” (Baldwin v New York, supra, at 69.)
Defendant urges this court to look beyond the standard established in Baldwin (supra) to the nature of the offense, as well as the maximum potential sentence, and to deem the offense of resisting arrest sufficiently serious as to require a jury trial. In support of his argument defendant traces the history of resisting arrest and extensively discusses the potential consequences of a conviction of the charge. Similar arguments were raised in Matter of Morgenthau v Erlbaum (59 NY2d 143 [1983]) regarding prostitution charges. In rejecting the position asserted by the defendants, the Court of Appeals at page 154 cited Codispoti v Pennsylvania (418 US 506, 512): "[0]ur decisions have established a fixed dividing line between petty and serious offenses: those crimes carrying a sentence of more than six months are serious crimes and those carrying a sentence of six months or less are petty crimes.”
The defendant is critical of the reclassification of class A misdemeanors by the Legislature into "serious” and "petty” categories. Defendant calls the statutory change arbitrary and insensitive to the consequences of a conviction. However, "in establishing sentences, the Legislature must be presumed to have weighed public opinion and history, and to have been aware of the civil implications of conviction.” (Matter of Morgenthau v Erlbaum, supra, at 154.)
Accordingly, the court does not find defendant’s Sixth Amendment challenge persuasive and denies that aspect of his motion.
THE EQUAL PROTECTION ISSUE
The defendant alleges that CPL 340.40 (2) violates his right to equal protection of the law on the ground that the 1984 amendment discriminates against members of his race and, therefore, cannot withstand the necessary "strict judicial scrutiny.” (McLaughlin v Florida, 379 US 184 [1964].)
Prior to an analysis of the issues raised, it is necessary to reiterate the rule for determination of equal protection claims. First, it is incumbent upon a defendant to prove he is a part of a "cognizable racial group” (Batson v Kentucky, 476 US 79 *592 [1986]); then the defendant must make out a prima facie case of racial discrimination (Washington v Davis, 426 US 229 [1976]) before the strict scrutiny standard comes into play. (Arlington Hgts. v Metropolitan Hous. Corp., 429 US 252 [1977].) As a general rule, "courts refrain from reviewing the merits of [legislative] decisions, absent a showing of arbitrariness or irrationality.” (Arlington Hgts. v Metropolitan Hous. Corp., supra, at 265.) However, in recognition of the seriousness of racial discrimination, "this judicial deference is no longer justified” once the prima facie threshold has been met. (Arlington Hgts. v Metropolitan Hous. Corp., supra, at 266.)
Defendant made a persuasive initial argument that the newly revised CPL 340.40 (2) has a disproportionate impact upon his racial group, namely, black citizens in New York State. In an excellent utilization of 1980 Census data, defendant presented a statistical analysis leading to the inescapable conclusion that 82.8% of the State’s total black population lives in the cities with a population of over 150,000 (those cities where jury trials are not afforded to defendants facing a maximum penalty of six months upon conviction of a class A misdemeanor). The data shows that only 39.9% of the non-black population lives in these cities; however, "such a disparity in racial impact alone does not call for strict scrutiny of a [legislative] decision” (Arlington Hgts. v Metropolitan Hous. Corp., supra, at 259). In fact, the constitutionality of statutes creating a particular impact on one race due to geographic distinctions has been specifically upheld on at least two occasions in the last two years. (See, United States v Dixon, 619 F Supp 1399 [SD NY 1985]; United States v Agilar, 779 F2d 123 [2d Cir 1985], cert denied 475 US 1068.) "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination”. (Washington v Davis, supra, at 242.)
Proof of a racially discriminatory intent or purpose is required, in addition, to show a violation of the Equal Protection Clause, and it is to this end that defendant has devoted substantial efforts in his argument. To demonstrate that a discriminatory purpose has been a motivating factor would present a tremendous proof problem in all but the most blatant of circumstances. (See, e.g., Gomillion v Lightfoot, 364 US 339 [1960], where the statistical pattern of invidious discrimination was extreme; Batson v Kentucky, supra, where discrimination in jury selection may be proven based upon the *593 facts in the particular case.) The Supreme Court recognizes this proof dilemma and has directed that "[determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.” (Arlington Hgts. v Metropolitan Hous. Corp., supra, at 266.)
Towards this end, defendant has concentrated upon three areas of concern. First, defendant asserts that the executive and legislative decision makers were aware of the great potential for disproportionate impact on blacks and nevertheless revised CPL 340.40 (2). In support of this statement defendant provides excerpts of the testimony taken on June 28, 1984 before the New York State Assembly. Numerous references were made to the fact that only major metropolitan areas would be affected, and one opponent of the legislation specifically voiced his concern for the discriminatory application of the denial of a jury trial in these cities. The court in Arlington Hgts. (429 US 252, supra), specifically recognized historical background as an appropriate area for inquiry in determining discriminatory purpose and, within that category, deemed the legislative and administrative history of an action to be "highly relevant”. (Supra, at 268.)
Second, through the use of its own statistics, defendant’s counsel details the differences in acquittal rates between the jury and nonjury cases handled by the Hiscock Legal Aid Society for the years 1983-1986 in Syracuse City Court. While the acquittal rate in nonjury trials ranged from 14.3% to 20.0%, the acquittal rate in jury trials ranged from 50.0% to 66.7%. Counsel would argue that these kinds of percentages might be found in all the cities affected by the Misdemeanor Reclassification Act; that there is an " 'inherent inequality’ in treatment”. There would appear to be tremendous potential for additional analysis of this and any similar data.
Lastly, defendant stresses that although the various memoranda (executive and legislative) submitted in support of the statutory revision cite a serious court backlog as the motivating purpose, there has not been evidentiary support for this position, particularly in Syracuse. In support of this conten-, tion, defendant cites the New York State Bar Association Criminal Justice Committee on Legislation’s Report dated June 28, 1984.
In response the Attorney-General redirects the court to the factors enumerated in Arlington Hgts. (supra) as being worthy *594 of consideration in determining discriminatory purpose: the extent of the impact, the historical background, events leading up to the action and legislative history.
CONSTITUTIONAL CONCLUSION
Based solely on the facts here presented, the court must deny defendant’s motion. It should be emphasized that this decision does not reflect a dissatisfaction with defendant’s efforts to prove a most difficult point. Having reviewed the evidence, it is obvious that the legislation has a much greater impact on the black population in New York than on any other group. "But there is little about the sequence of events leading up to the decision [presented for our review] that would spark suspicion” (Arlington Hgts. v Metropolitan Hous. Corp., supra, at 269) that there was other than case overload for which a solution was sought. The court congestion problem is not a novel or fictitious one, having been cited frequently by the Office of Court Administration as a major cause of the ills that afflict our judicial system.
In this case, on the facts presented, "[respondents simply failed to carry their burden of proving that discriminatory purpose was a motivating factor in the * * * decision [at hand].” (Arlington Hgts. v Metropolitan Hous. Corp., supra, at 270.)*
INSUFFICIENCY OF ACCUSATORY INSTRUMENT
On its own motion the court dismisses the misdemeanor information based on a recent New York Court of Appeals case decided on June 11, 1987 (People v Alejandro, 70 NY2d 133).
In Alejandro (supra), the court held that a misdemeanor information charging resisting arrest was insufficient on its face because it did not contain factual allegations that the police officer was making an "authorized arrest”. The factual portion of that information read in part as follows: " 'resisting a lawful arrest’ ” (People v Alejandro, supra, at 136 [emphasis added]), merely mimicking the language of the statute. Not only does the factual portion of the criminal information in *595 the instant prosecution fail to make a conclusory statement that the arrest was authorized; it totally fails to satisfy the requirement concerning factual allegations.
CONCLUSION
Misdemeanor complaint charging resisting arrest is dismissed.

 The amendment was recently extended to July 1, 1988 (L 1987, ch 727). The court urges that in the next year the Legislature make a comprehensive analysis of all the ramifications of the law with a close look at the obvious ultimate discriminatory effect on the black population of the major cities.