**Ex parte Pamela Board DANIELS.**

No. 69427.

Court of Criminal Appeals of Texas, En Banc.

Jan. 14, 1987.

Robert F. Alexander, Houston, for appellant.

John B. Holems, Jr., Dist. Atty. and Edward D. Porter, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Judge.

This is an application for writ of habeas corpus filed pursuant to the provisions of Article 11.06, V.A.C.C.P.

Applicant was held to be in direct criminal contempt of court by the Honorable Max W. Boyer, sitting by assignment in the 308th District Court in Harris County.[1] The contempt order was the result of an incident which occurred on January 22, 1985, while applicant was appearing pro se.

In the course of the proceedings, applicant became involved in an argument with Judge Boyer. The judge ordered applicant to leave the courtroom and to not return until she obtained counsel. When applicant failed to leave the courtroom immediately, the bailiff was ordered to escort her out.

Applicant apparently went peacefully with the bailiff until they reached the doorway of the courtroom. At that point, applicant is alleged to have physically attacked the master of the court. The bailiff then moved to restrain applicant and a general disturbance erupted in which several people were involved.

The record indicates that at some point after this occurrence the trial judge ordered applicant brought before him for a summary contempt proceeding. During

---

1. Applicant was sentenced pursuant to the provisions of Article 1911a, V.A.T.C., which has been repealed by Section 1 of Acts 1985, 69th Leg., ch. 480, which enacted Title 2, Judicial Branch of the Government Code which became effective on September 1, 1985.

the course of this hearing, applicant did not have the benefit of retained counsel but instead continued to act in a pro se capacity. Applicant was found to be in direct criminal contempt and ordered to be confined in jail for a period of thirty days. No fine was imposed. Applicant was ordered to pay thirty-three dollars in court costs.

Applicant, now represented by retained counsel, alleges two grounds of relief in her application for writ of habeas corpus. Applicant first argues that her confinement is illegal because she was denied due process of law in that she was denied counsel during the contempt proceedings. Second, applicant argues that her confinement is illegal because she is being denied equal protection of the law because the sheriff of Harris County is denying her credit for good behavior shown during time served.

■ Contempt power is a necessary and integral component of judicial authority. *Gompers v. Bucks Stove & Range Company,* 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed.2d 797 (1911). While it is clear the exercise of this authority should be tempered with common sense and sound discretion, contempt power is accorded wide latitude because it is essential to judicial independence and authority. *Ex parte Browne,* 543 S.W.2d 82 (Tex.Cr.App.1976); *Shillitani v. United States,* 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966).

■ At the outset of any discussion or judicial determination of the right of due process in a contempt case, it is necessary to distinguish "direct" contempt from "constructive" contempt. Direct contempt is contempt which is committed or occurs in the presence of the court. In direct contempt cases the court has direct knowledge of the facts which constitute contempt. Constructive or indirect contempt involves actions outside of the presence of the court. Constructive contempt refers to acts which require testimony or the production of evidence to establish their existence.

■ The distinction is important because due process imposes different standards for the proceedings in which the contempt is adjudicated. In cases of constructive contempt in which factual issues relating to activities outside the court's presence must be resolved, due process requires the accused be afforded notice and a hearing. *Ex parte Standard,* 596 S.W.2d 218 (Tex.Cr.App.1980); *Ex parte Mouille,* 572 S.W.2d 60 (Tex.Cr.App.1978). In a situation involving indirect or constructive contempt, the contemner cannot be legally confined without a reasonable opportunity to obtain counsel. *Cooke v. United States,* 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925); *Ex parte Flournoy,* 312 S.W.2d 488 (Tex.1958), and cases cited therein.

■ In cases of direct contempt, however, the behavior constituting contempt has occurred in the presence of the court. The judge has personal knowledge of the events in question and the court is allowed to conduct a summary proceeding in which the contemner is not accorded notice nor a hearing in the usual sense of the word. *Ex parte Flournoy,* supra; *Ex parte Norton,* 610 S.W.2d 512 (Tex.Cr.App.1981).

■ Furthermore, in cases of direct contempt, the accused has no right to counsel. *Cooke v. United States,* supra; *Ex parte Norton,* supra. The right to counsel is, of course, one of the most fundamental protections guaranteed under the United States Constitution. The rationale for this very limited exception to the basic principle of the right to counsel was explained in the case of *Cooke v. United States,* supra:

"To preserve order in the courtroom for the proper conduct of business, the court must act instantly to suppress disturbance or violence or physical obstruction or disrespect to the court, when occurring in open court. There is no need of evidence or assistance of counsel before punishment, because the court has seen the offense. Such summary vindication of the court's dignity and authority is necessary. It has always been so in the courts of the common law, and the punishment imposed is due process of law...." 267 U.S. at 394, 45 S.Ct. at 534.

This Court has noted in *Ex parte Flournoy*, supra:

> "... [R]elator was committed for, and only for, a direct contempt represented by his failure and refusal to obey the command of the court, given in open court, to disclose to the court the whereabouts of the minor child and to produce him in court so that the court might exercise its jurisdiction to deal with the custody of the child in his own best interests. Litigants and others appearing in court are certainly not entitled to counsel and a hearing before they may be committed for every type of direct contempt." At 492.

See also, *Ex parte Terry*, 128 U.S. 289, 95 S.Ct. 77, 32 L.Ed. 405 (1975).

Applicant has argued that the acts of contempt which she is accused of having committed did not take place in the judge's presence. Applicant states that the judge did not actually see much of the activity which took place at the door of the courtroom. Applicant states that the judge required testimony before he could make a complete determination that contemptuous actions occurred. Therefore, applicant argues her contempt was constructive rather than direct and applicant therefore argues that she was denied due process because she was denied the right of counsel.

The record reflects that the activities which gave rise to applicant's being held in contempt occurred in the 308th District Court while Judge Boyer was present and seated at the bench. Applicant states in effect that due to the rapid and confusing sequence of events the judge did not actually see everything that occurred, but only witnessed a general disturbance. Applicant urges this Court to accept the proposition that this means the actions constituting contempt did not occur in the presence of the court.

Applicant overlooks the fact that "in the presence of the court" does not necessarily mean in the immediate presence of the trial judge. *Ex parte Aldridge*, 169 Tex.Cr.R. 395, 334 S.W.2d 161, 169 (1960). As we stated above, the rationale justifying the harsh remedy of direct contempt adjudications is that the authority and ability of the courts to conduct the peoples' business is compromised by the disruptive actions of the alleged contemner. *Ex parte Harvill*, 415 S.W.2d 174 (Tex.1967); *Ex parte Gordon*, 584 S.W.2d 686 (Tex.1979). It is for this reason that this Court has held that the court is present whenever any of its constituent parts, the courtroom, the jury and the jury room are engaged in pursuing the work of the court. *Ex parte Aldridge*, supra. It was for this reason that the applicant in *Ex parte Aldridge*, supra, was properly determined to have committed direct contempt when he placed contemptuous publications in the corridors of the courthouse where prospective jurors would necessarily see them. *Ex parte Aldridge* 334 S.W.2d at 169.

In the case before us, it is clear that applicant's behavior was sufficiently "before the court" to justify a determination that she was in direct contempt of the court. Her actions took place in the presence of the trial judge. Even though some details of the disturbance were not noted by the trial judge due to the confusion and rapid sequence of the events does not mean the incident did not occur in the presence of the court. It is undisputed that the judge witnessed what he considered a disturbance and felt compelled to interrupt court business and intervene in the activities which took place at the courtroom entrance. The judge felt it was necessary to further interrupt the court's business by calling a recess.

The bailiff and the master of the court are court officers. The ability of the 308th District Court to conduct its duties was compromised by the direct physical attack on one of its officers in the courtroom and in the physical presence of the trial judge. As such, applicant's actions constitute direct contempt.

Applicant's second ground of error alleges a violation of equal protection because the sheriff of Harris County has not given her credit for good behavior. Applicant

alleges that it is the policy of the Harris County Sheriff's Department to award credit on sentences for demonstrated good behavior. Applicant states that all other prisoners in Harris County receive such consideration.

In addressing this contention, we find guidance in the opinion of the Amarillo Court of Appeals in *Ex parte Rogers,* 633 S.W.2d 666 (Tex.App.—Amarillo, 1982):

"The threshold question for our determination is whether a county sheriff may give 'good time' credit on a jail term assessed as punishment for criminal contempt of court. . . .

"Article 5118a, Tex.Rev.Civ.Stat.Ann. (Vernon Pamphlet Supp.1971–1981), provides in pertinent part:

In order to encourage county jail discipline, a distinction may be made in the terms of prisoners so as to extend to all such as are orderly, industrious and obedient, comforts and privileges according to their deserts; . . . Commutation of time for good conduct, industry and obedience may be granted the inmates of each county jail by the sheriff in charge.

"In construing this statute, in a somewhat different context, the Court of Criminal Appeals has said, '[s]uch statute provides that the sheriff shall have the sole discretion in granting commutation of time of *Those prisoners in his custody serving jail terms in the county jail.*' [Emphasis added.] *State ex rel. Vance v. Clawson,* 465 S.W.2d 164, 168 (Tex.Cr.App.), cert. denied sub nom. *Pruett v. Texas,* 404 U.S. 910, 92 S.Ct. 226, 30 L.Ed.2d 182, rehearing denied 404 U.S. 996, 92 S.Ct. 529, 30 L.Ed.2d 548 (1971).

"The question whether Article 5118a gives the sheriff power to commute time for prisoners serving contempt sentences is apparently one of first impression. Both the Court of Criminal Appeals and our Supreme Court have, however, decided similar issues relating to contempt by analogizing from the procedures followed in misdemeanor cases.

"In *Ex parte Heptinstall,* 118 Tex. Cr.R. 160, 39 S.W.2d 75 (1931), our Court of Criminal Appeals, in deciding whether a woman found in contempt and sentenced to pay a $100.00 fine and serve 3 days in jail should be released without first having paid her fine, said:

This not being a civil but a criminal contempt, [citations omitted], the fine, if not reduced by a judgment of the court in which it was entered, must be paid or satisfied in the same manner as prescribed by law for the satisfaction of a conviction for a misdemeanor. . . . Id. 39 S.W.2d at 76.

"The court went on to hold that relator must satisfy the judgment by either paying or serving out her fine before she should be entitled to release. Id.

"Our Supreme Court used a like analysis in *Ex parte Genecov,* 143 Tex. 476, 186 S.W.2d 225 (1945). There, the issue was whether the court had power to 'assess punishment for more than one act of contempt in a single proceeding, although the aggregate punishment assessed exceeds the punishment which the court is authorized to assess for a single contemptuous act. . . .' Id. 186 S.W.2d at 226–27. Holding that the court does have the power to do so, our court of superior jurisdiction stated that contempt is analogous to a misdemeanor. Id. 186 S.W.2d at 227. A defendant may be convicted of separate, independent misdemeanors in a single information, the court reasoned, therefore, a contemnor may be found to have committed, and be assessed punishment for, more than one act of contempt in one proceeding. Id.

"Utilizing the misdemeanor analogy, we find the sheriff was authorized by Article 5118a to give relator 'good time' credit on her thirty-day sentence for contempt. By its terms, Article 5118a applies to all persons serving jail terms in county jail, including, of course, those convicted of misdemeanors. *State ex rel. Vance,* 465 S.W.2d at 168. Thus, just as the sheriff may give those serving misdemeanor sentences credit for

'good time' served, he may likewise do so on a sentence for criminal contempt...." [Emphasis in original opinion.] *Ex parte Rogers* at 668–669.

██ We likewise find that a county sheriff is authorized to give 'good time' credit to one serving a sentence for criminal contempt. However, since the granting of such 'good time' credit rests solely in the discretion of the sheriff, *State Ex rel. Vance v. Clawson,* supra, and since the instant record fails to reveal any facts tending to demonstrate an abuse of such discretion, we will not interfere.

The relief prayed for is denied.

MILLER, J., concurs in the result of the first ground.

CAMPBELL, Judge, concurring and dissenting.

While I believe the majority reached the correct result in this case, I write once again, as I did in *Ex Parte Krupps, et al.,* 712 S.W.2d 144 (Tex.Cr.App.1985) to address what I perceive to be a serious misinterpretation of the law of contempt.

At Maj. opinion pg. 710, the majority observes that in the presence of the court "does not necessarily mean *in* the immediate presence of the trial judge" and further, that "the court is present whenever any of its constituent parts, the courtroom, the jury and the jury room are engaged in pursuing the work of the court." Citing *Ex Parte Aldridge,* 169 Tex.Cr.R. 395, 334 S.W.2d, 161 (1960) the majority continues that "it was for this reason that the applicant in *Ex Parte Aldridge,* supra, was properly determined to have committed direct contempt when he placed contemptuous publications in the corridors of the

courthouse where prospective jurors would necessarily see them."

From my reading of the instant case, the contumacious conduct took place *immediately in front of the judge* (emphasis added) and it is therefore unnecessary for the majority in the instant case to revisit the gymnastics engaged in Krupps where it was observed "that court personnel, such as bailiffs, and implicitly, one imagines, court reporters, clerks, docket coordinators, probation officers, prosecutors, etc., may, through some sort of agency theory observe contumacious conduct, report said conduct to the unsuspecting judge thereby magically transforming constructive contempt into direct contempt, all in the name of and by the authority of being officers of the court." *Ex Parte Krupps,* at 160 (Campbell, J. Dissenting).

CLINTON, Judge, dissenting.

The opinion of the Court states, "At the outset of any discussion or judicial determination of the right of due process in a contempt case, *it is necessary to distinguish 'direct' contempt from 'constructive' contempt.*"[1] Concerning that exercise at the threshold, elsewhere I have observed:

"The notion seems to be that once the proper light [of classification of kind and nature of contempt] is turned on given active and passive conduct, one will know he is seeing a particular type of contumacious conduct and then is enabled to critique it according to its narrow contextual classification and surrounding traditional trappings. Sometimes, however, a problem defies classification by label, and thus may not be resolved by rote."

In my view this is one of those problems.[2]

The written order of contempt recites, *inter alia,* that after a hearing in the fami-

1. All emphasis is mine throughout unless otherwise indicated.

2. Appearing pro se in an underlying family law matter, perhaps because applicant simply did not know how to protect it, she presents an incredibly meager record. Essentially we have a short statement of facts and a written order of "direct contempt." The first seventeen pages of the former report a lengthy colloquy among the

judge of the trial court, counsel for others and applicant leading to orders that she be removed from the courtroom; the last four pages reflect a brief exchange between the judge and applicant, his pronouncing an order of contempt, signing it, having a clerk certify a copy, handing it to a bailiff, directing him to take custody of applicant and commit her to jail and, finally, denying her request to make a statement. The

ly law matter applicant "was ordered by this Court to be removed from the Courtroom for causing a disturbance at the bench."[3] According to the brief on behalf of the judge, at the courtroom door applicant "tried to strike the Master of the Court in the head with her purse or briefcase at which time the bailiff threw [applicant] against the wall and had to tackle [applicant]."

In her brief applicant contends "that it was only after being *told* of an alleged incident in the doorway to the courtroom—only after relying on the word of the bailiff, the Master, and possibly others—that the judge found Applicant in contempt." [emphasis by applicant]. To that the brief for the judge correctly responds that the record does not reflect he had any discussion with anyone, but elsewhere states:

"Although Judge Boyer expressed *no knowledge* of the attempt to assault the Master of the Court, Judge Boyer was aware that Applicant had done *something* at the courtroom door which disrupted the Court's business."

In pronouncing findings in his order of contempt *inter alia* the judge stated, "This conduct was committed within an area which was within the presence of the Court and where the Court *could* hear and observe the conduct"—not that he did.

In the event, regardless of what the judge did or did not hear or see of the "second disturbance"—that at the entrance to the courtroom—according to applicant, she was detained in a conference room for four hours; the judge was preparing the order of direct contempt, says his brief—until he convened court for a contempt proceeding. Already bereft of counsel in the primary matter, perforce applicant again had to represent herself.

---

latter contains findings of fact and conclusions of law.

Accordingly, some factual statements tending to explain what occurred are taken from uncontested or reconciled recitations in briefs of applicant and of the trial judge, respectively. See Rule 74(f), Texas Rules of Appellate Procedure.

3. An exchange immediately preceding that order went to a stated determination by the court to pass the case until applicant retained counsel; she objected and announced she would "refuse to leave until I get justice," only to be told by the judge that she would be taken bodily from the courtroom; applicant rejoined that she could not afford to hire an attorney and said, "I appeal right now." Then came the following:

"THE COURT: From what you were saying, you don't think you will get justice from me, do you, the way I am acting?

[APPLICANT]: I thought I would.

THE COURT: You don't think so now, do you?

[APPLICANT]: You could change your ruling. You could ask counsel—

THE COURT: I didn't ask you that question. Do you think you will get justice from this Court?

[APPLICANT]: Is this—

THE COURT: You have heard what I said.

[APPLICANT]: Is this a democratic court?

THE COURT: There is no politics in this court.

[APPLICANT]: I pay my taxes.

THE COURT: This Court tries to deal in dispatch and there is no way I can deal in dispatch with a person like you.

Remove her from the courtroom. I order you to remove this woman from the courtroom and don't permit her to come back in. The only way you can permit her to come back in is to have counsel with her.

[The bailiff asked applicant to leave with him; she protested that "he can't do that to me," but was informed "he can;" the judge told the bailiff to get help if needed and to "remove her without further activity."]

[APPLICANT]: I want to take a picture of this. I don't believe this and I object. This is not justice and I don't accept it.

\* \* \* \* \* \*

THE BAILIFF: Let's go.

THE COURT: And don't let her back in this courtroom unless she has counsel.

(Mrs. Daniels took a picture of the Judge.) (Recess)."

The last parenthetical note of the court reporter is so ambiguous that one cannot tell whether the court or the case was "recessed." If the court had recessed just after applicant had taken a picture of the judge, it was not engaged in business when the "second disturbance" occurred. From that notation the majority opinion infers that *after the disturbance at the courtroom door* the judge interrupted the court's business "by calling a recess," but if the court had turned to other business the court reporter should have been taking down proceedings in that other matter rather than in instant cause. Most likely the reporter was indicating a recess of the case rather than the court.

After calling for the court to be in order, the judge announced, "The Court has made certain findings concerning [the family law matter]." Denying her request to record the proceedings, he then stated into the record findings and order of the Court and promptly ordered her committed, *viz:*

"THE COURT: She is remanded to jail. [APPLICANT]: *May I make a statement?*
THE COURT: *No, you may not.*"

Principally relying on *Ex parte Aldridge*, 169 Tex.Cr.R. 395, 334 S.W.2d 161 (Tex.Cr. App.1960), the majority reasons that her contumacious conduct was committed "in the presence of the court." *Ergo,* the matter is a "direct contempt." Let us revisit *Ex parte Aldridge,* supra.

Honorable Paul McCollum was Judge Presiding of the court in which a criminal case was proceeding through jury selection to trial. There had been circulated in and around the courthouse, including a area where prospective jurors were being kept, a "news" publication critically mentioning the trial, Judge McCollum and his relationship with attorney for the accused. Learning of that, Judge McCollum conferred with counsel for the parties, concluded that a fair trial could not then be held, discharged the venire and postponed the trial; then he initiated an investigation "as to the propriety of a contempt proceeding." *Aldridge,* 334 S.W.2d at 162–163.

The State instituted the contempt proceeding against Aldridge "by filing a complaint in the district court seeking to have the relator adjudged in contempt of court" for publishing and circulating a "news" publication deemed offensive by nearly all affected parties, and the opinion of the Court reproduces at length those allegations charging the publication was contemptuous. *Aldridge,* at 163–164. Though the opinion does not say when, a contempt proceeding came on for trial before a different judge, Honorable J.H. Starley; relator defended on constitutional grounds of freedom of the press and denial of due process. *Id.,* at 164. Judge Starley rendered the judgment of contempt based on extensive findings of facts made by him for the court.

"At the outset, let it be understood that we are not committed to the proposition that this is a case of constructive contempt—that is, one occuring outside the presence of the court—as distinguished from direct contempt, which occurs in the presence of the court."

*Aldridge,* at 165.

On original submission, as the majority opinion here points out, the *Aldridge* court determined, "The court is present whenever any of its constituent parts are engaged in the prosecution of the business of the court, which constituent parts include the judge, the courtroom, the jury, and the jury room." *Ibid.* Though the offensive publication was not actually distributed and circulated in the courtroom, "*the undisputed evidence shows* that the publication was circulated and placed in the immediate presence of those prospective jurors who were waiting [in the place assigned them] outside the courtroom in the corridors of the courthouse ... before being called to be examined and selected upon the jury then in the process of being selected." *Ibid.* Accordingly, the Court found "presence of the court extended to and included the prospective jurors and the place assigned to them to wait." *Ibid.* Thus if the trial court correctly found that the publication had "interfered with the due administration of justice in a case which was then on trial," then "direct contempt was shown to have been committed in the presence of the court ..." *Ibid.*

Turning to address the findings made by the judge assigned to hear the contempt proceeding the Court found they were supported by ample evidence, and so held:

"The conclusion is reached that the trial judge was authorized to reach the conclusion and enter the judgment that he did in holding relator in contempt of court."

*Aldridge,* at 167.

By now the point of this close review of *Aldridge* should be obvious: Though the

Court labeled it a case of "direct contempt," as outlined and described by the Court, Judge McCollum, counsel for the parties and Judge Starley handled the proceedings from beginning to end in a form of constructive contempt!

Writing for the Court on rehearing, Judge Morrison recognized and acknowledged that "this proceeding appears to have been initiated and tried on the theory that relator was guilty of constructive contempt ..., *id.*, at 167. Accordingly, having reexamined the record and alluding to additional evidence of the part played by relator in the affair, the Court concluded that "the State *proved* that relator published the contemptuous matter which constitutes the basis for this proceeding," *ibid.* The motion for rehearing was therefore overruled. *Id.*, at 168.

In the instant cause alleged contemptuous conduct took on a form that is not susceptible to easy classification as either constructive contempt or direct contempt. Clearly a "disturbance" occurred at an entrance to the courtroom in which applicant was involved. While the majority opinion says that the judge felt "compelled to interrupt court business and intervene in the activities which took place at the courtroom entrance," and that "it was necessary to further interrupt the court's business by calling a recess," I find no support for that conclusion—unless the majority means that the judge recessed to investigate the matter by speaking to the bailiff and others and then prepared his order of contempt. After a lapse of time the judge did reconvene court, state his findings of fact and conclusions of law and order of contempt he rendered for the court. What is presented here is at best a hybrid form of contempt, and a proceeding which the brief for the judge concedes was not "a hearing as to the issue of contempt."

Regardless of its label, the ultimate question is whether the proceeding comported with requisites of due process in the premises. *Codispoti v. Pennsylvania*, 418 U.S. 506, 94 S.Ct. 2687, 41 L.Ed.2d 912 (1974) and *Taylor v. Hayes*, 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974), have taught us that when a trial judge does not convict and sentence for various disruptive acts "as they occur," "there is no overriding necessity for instant action to preserve order and no justification for dispensing with the ordinary rudiments of due process," *Codispoti*, supra, 418 U.S. at 513, 515, 94 S.Ct. at 1692. "On the other hand, where conviction and punishment are delayed, 'it is difficult to argue that action without notice or hearing of any kind is necessary to preserve order and enable [the court] to proceed with its business,'" *Taylor v. Hayes*, supra, 418 U.S. at 498, 94 S.Ct. at 2703. See *Ex parte Martin*, 656 S.W.2d 443 (Tex.Cr.App.1982).

Just as summary convictions during trial that are unwarranted by the facts, so also one like this "will not be invulnerable to appellate review" by a court "duty bound to make an independent examination of the evidence in the record." *Codispoti*, supra, 418 U.S. at 517, 94 S.Ct. at 2694, and n. 6. Having made such an examination of the facts and applicable law, my best judgment is that to remand applicant "to the custody of the Sheriff of Harris County to serve the ordered sentence" is to sanction a denial of due process in the premises.

Applicant was not convicted and sentenced for creating the second disturbance "as it occurred." The bailiff had been ordered by the judge only to remove her from the courtroom, and that was done. Though the majority says the judge "witnessed what he considered to be a disturbance," clearly the judge did not then and there summarily hold her in contempt. Rather, under authority not revealed by this record, she was detained elsewhere for an extended period—four hours, according to her brief, or the time taken while the court was in recess in order for the judge to prepare and include written findings and conclusions in the order of contempt, according to the brief for the judge—before being taken back into court. By then "action without

notice or hearing of any kind [was not] necessary to preserve order and enable [the court] to proceed with its business." [4]

Furthermore, after the order was pronounced, though she specifically requested it, applicant was denied "an opportunity to speak in [her] own behalf in the nature of right to allocution," and was thereby denied process that is due "[e]ven when summary punishment for contempt is imposed during trial," *Taylor v. Hayes,* supra, 418 U.S. at 498, 94 S.Ct. at 1703.

Accordingly, I respectfully dissent.

TEAGUE and DUNCAN, JJ., join.

[4]. We judicially know that Honorable Max W. Boyer is a retired trial judge. See 1 Texas Legal Directory 1985, p. 1454. Contrary to another lesson of *Taylor v. Hayes,* supra, despite the personal nature of stormy exchanges at the bench while hearing the family law matter, the visiting judge apparently did not consider having a local judge conduct a contempt proceeding.

"But contemptuous conduct, short of a personal attack, may still provoke a trial judge and so embroil him in controversy that he cannot 'hold the balance nice, clear, and true between the state and the accused....' [citations omitted throughout]. In making this ultimate judgment, the inquiry must be not only whether there was a actual bias on respondent's part, but also whether there was 'such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused.' 'Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties,' but due process requires no less."
Thus when it appears that a trial judge does become "embroiled in a running controversy with a [party]" and "there [is] a mounting display of an unfavorable personal attitude toward [that party], his ability and his motives, sufficiently so that the contempt issue should [be] finally adjudicated by another judge ..., [one] should [be] substituted for the purpose of finally disposing of the charges of contempt...." *Taylor v. Hayes,* supra, 418 U.S. at 501–503, 94 S.Ct. at 2704–2705.