# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-06-00752-CR
NO. 03-06-00753-CR
NO. 03-06-00754-CR
NO. 03-06-00755-CR
NO. 03-06-00756-CR
NO. 03-06-00757-CR
NO. 03-06-00758-CR
NO. 03-06-00759-CR

**James Marlin Ebert, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE COUNTY COURT AT LAW NO. 6 OF TRAVIS COUNTY**
**NOS. 699540, 699541, 699542, 699543, 699544, 699545, 699546, 699547,**
**HONORABLE WILLIAM E. BENDER, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

A jury found James Marlin Ebert[1] guilty of four counts of simulating legal process

and four counts of filing a record of a fraudulent court. *See* Tex. Penal Code Ann. §§ 32.48, 37.13

(West 2003). The jury assessed sentence at 30 days in jail and a $100 fine in each case. The court

---

[1] Appellant punctuates his name at times with a hyphen between James and Marlin and at times with a colon between Marlin and Ebert. He asserts that the capitalization of all the letters of a name converts a human into a corporation. He rejects the validity or enforceability of documents that punctuate or capitalize his name in what he defines as incorrect ways. Having reviewed the relevant facts and law, we conclude that these punctuation and typeface choices have no legal significance in this case. Contrary to Ebert's assertion, Texas Rule of Civil Procedure 52 does not address capitalization of a corporation's name. The Texas Business Corporations Code requires more than mere capitalization of an individual's name in order to form a corporation.

also found Ebert in criminal contempt for leaving the courtroom during the sentencing hearing and assessed a 60-day term of confinement to be served consecutively to the jail term on the eight convictions. Ebert raises 23 issues on appeal on topics including the structure of government and the judicial system, the competence and applicability of charging instruments, and the legal significance attributable to the use of symbols and flag ornamentation. We affirm.

The convictions in these causes arise from Ebert's filing documents at the Travis County clerk's office. He filed four documents entitled "NON-NEGOTIABLE DECLARATION OF **ABSTRACT OF JUDGMENT** IN THE NATURE OF AN AFFIDAVIT." He filed four documents entitled "AFFIDAVIT of NON-PAYMENT." He filed one of each type of document relating to four individuals: Rosamunda E. Findeisen, Peter Sajovich, Francis Truchard, and "COLORADO COUNTY, JUSTICE OF THE PEACE, PCT 3, et al." The documents list these individuals as debtors to Ebert for the following amounts in "dollars, silver specie,"[2] plus 10%

---

[2] Ebert states that, unlike the charging instruments and other documents supporting his arrest and prosecution, the documents he filed do not include a "$." This argument is irrelevant to the offenses charged because their essence depends, not on the currency used, but on the simulation of official documents to induce payment or other effect. Further, Ebert's documents state the amounts due in "dollars, silver specie." We take judicial notice that the symbol "$" is commonly substituted for the word "dollars." *See* Tex. R. Evid. 201. Ebert's asserted unilateral rejection of a commonly used symbol is ineffective absent evidence that the symbol term is inapplicable and, more specifically, that the creator of the original document clearly and effectively communicated that inapplicability to the readers of his document (i.e., a statement that the word "dollars" did not refer to United States currency, commonly denoted by "$" in the United States, but another defined and recognized currency). There is no such evidence in these records. If such arguments alone sufficed, litigants could just as easily escape responsibility for their actions by revealing, for example, that they assign different sounds to letters of the alphabet, calculate sums in base 8 rather than base 10, or mean "matchsticks" or "play money" when typing "dollars." Such post hoc claims regarding the "true" nature of a particular communication do not suffice to alter the nature of the representations.

interest plus penalties: Findeisen, $35 million; Sajovich, $147,000; Truchard, $16,378,927; and the justice of the peace, $2,006,000.

Testimony adduced at trial showed that the individuals named as debtors were associated with either the foreclosure sale of Ebert's property or his arrest at that foreclosure sale. Findeisen testified that she was the substitute trustee on the foreclosure sale of property Ebert owned. Sajovich testified that he was the president of eCounty Foreclosures, Inc., a company whose Web site listed Ebert's property as being subject to foreclosure, then delisted it at Ebert's request, and unintentionally relisted it after a contractor's computer server crash triggered the use of a backup file that included the listing of Ebert's property. Truchard, according to the testimony of Bradley Parks, was the justice of the peace of Precinct 3 of Colorado County listed on an arrest warrant based on a speeding violation. Parks testified that he was a Travis County sheriff's deputy at the time of the sale and arrest, and attended the foreclosure sale in order to arrest Ebert based on that warrant.

Other witnesses described the filing and nature of the documents in question. Betty Anderson, manager of the Travis County clerk's office recording division, identified Ebert as the person who filed the abstracts of judgment. She said that the nature of the documents caused a clerk to bring the documents to her attention, and she requested an opinion from the county attorney regarding whether she should file the documents. The county attorney advised her to file the documents and to notify the persons named as debtors. Attorney Tim Labadie of the Travis County Attorney's Office testified that the abstracts of judgment Ebert filed at the county clerk's office did not meet the requirements of state law for abstracts. *See* Tex. Prop. Code Ann. § 52.003 (West 2007). The abstracts lacked the name of a court that rendered a judgment, a cause number of

3

a suit, and a date of a judgment. *See id*. Labadie testified that the abstracts referred to the affidavits of non-payment as establishing the debt rather than a judgment of any court. He testified that filing a document that resembles an abstract of judgment could make selling property difficult for the persons named in that abstract.

The jury found Ebert guilty of four counts of simulating legal process and four counts of making a record of a fraudulent court. The jury assessed a sentence of 30 days in jail and a $100 fine for each of the eight convictions. The trial court also found Ebert in direct contempt of court for walking out of the courtroom during the sentencing hearing despite the court's direction that he come forward. The trial court ordered Ebert jailed for 60 days for the contempt.

Ebert presents 23 issues on appeal in the form of questions to which he seeks "responsive and definitive answers." His questions invite discourse on theories of social compacts, the nature of government, the rights of individuals living in a geographic region, and how those rights may be affected by a government created by previous residents of that geographic region and maintained by representatives selected by qualified individuals residing in that geographic region.[3]

---

[3] The issues presented in Ebert's brief are as follows:

1. By what authority, color of law or otherwise, can a <u>peaceful</u>, <u>private</u>, <u>non-consenting</u> man on the land, a sui juris neutral American Citizen National, one of the People, recognized by law as sovereign, (a) have his private affairs trespassed; (b) be compelled to performance, bound into a condition of servitude; (c) arrested & incarcerated without proper warrant; (d) have bond money coerced; (e) be deprived of due process; (f) be deprived of witnesses in his favor; (g) be deprived of constitutional court; (h) be deprived of constitutionally qualified or otherwise authorized prosecutor; (i) be deprived of constitutionally qualified judge; (j) be deprived of confronting his accuser; (k) involuntarily made to enter a foreign state; (l) be deprived of his liberty; (m) be coerced to turn over money to be released from incarceration; (n) be made to endure the unwarranted duress, humiliation and stigma of this action for the rest of his time?

4

2. Is Texas a free and independent State, a sovereign republic, subject only to the Constitution of the United States and the men and women who dwell on the Land in the territory known as Texas?

3. Is the Texas Constitution law of the land or otherwise and have previous versions been repealed, annulled or otherwise voided?

4. Who is subject to the Texas Constitution?

5. How might a man or woman be made subject to the Texas Constitution?

6. Is the so-called Texas Penal Code duly enacted constitutional law?
      a. If the so-called Texas Penal Code is duly enacted law then who or what is made subject to it and to whom or what is it applicable?

7. Is the Texas Penal Code common law or civil law?

8. Are men and women, sovereigns, subject to Code?

9. What is the so-called and so styled [THE] STATE OF TEXAS?

10. Can a State/state/STATE be lawfully erected and operated within a State?

11. Can men and women contract their rights away to the so-called and so-styled [THE] STATE OF TEXAS?

12. Can men and women have their rights taken away by the so-called and so-styled [THE] STATE OF TEXAS?

13. Is involuntary servitude lawful or otherwise permissible in (1) Texas, in (2) this state or in (3) the so-called and so styled [THE] STATE OF TEXAS?

14. What is **"Notification of legal responsibility"** in a matter such as this one?

15. Are the charging instruments, <u>AFFIDAVIT FOR WARRANT OF ARREST AND DETENTION</u>, <u>COMPLAINT</u>, <u>INFORMATION</u>, and <u>AMENDED INFORMATION</u>, each in <u>this</u> <u>particular</u> <u>matter</u> competent and applicable?

16. Do state officers have constitutional requirements made of them prior to and during their tenure in whatever position they choose to hold?

5

Discourse on all of these topics would exceed the scope of this Court's jurisprudential responsibility to decide this case only on the issues necessary for a final disposition. *See* Tex. R. App. P. 47.1. Consequently, we will restrict our opinion to those issues.

Ebert contends that his abstracts of judgment fell outside of the Texas Constitution, "[THE] STATE OF TEXAS," and "Travis County." The Texas Constitution was established by the people of the State of Texas in 1876. *See* Tex. Const. preamble; *see also id*. interp. commentary. It states that "Texas is a free and independent State, subject only to the Constitution of the United States . . . ." Tex. Const art. 1, § 1. It also provides as follows:

> All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit. The faith of the people of Texas stands pledged to the preservation of a republican form of government, and, subject

---

17. Should state officers choose not to abide by constitutional requirements, are actions taken by them during a supposed exercise of their responsibilities lawful, legal or to be regarded as such?

18. Are men and women harmed and damaged when, involuntarily or otherwise, they are subjected to the actions of a supposed state officer who chooses not to abide by constitutional requirements or law?

19. Are Texas courts bound by supreme Court decisions?

20. Is the Travis County Court at Law Number Six a constitutional court?

21. Does William G. Swaim, III actually represent, or have authority to represent, any - one, body, or thing - other than himself?

22. Was one Bill Bender constitutionally qualified to be acting as Judge in this matter?

23. Does the flag presented within a venue signify the Law of that venue?

to this limitation only, they have at all times the inalienable right to alter, reform or abolish their government in such manner as they may think expedient.

*Id*. § 2. The constitution divides the powers of the government into three departments: the legislative, the executive, and the judicial. *Id*. art. 2, § 1. The constitution authorizes the legislature to pass bills to enact laws. *See generally id*. art. 3. Among the many laws passed are those encompassed by the government code and the penal code. The constitution acknowledges that a citizen may be deprived of liberty or property by due course of the law of the land. *See id*. art. 1, § 19. The Court of Criminal Appeals has interpreted the latter clause as follows: "By the law of the land is most clearly intended the general law; a law which hears before it condemns, which proceeds upon inquiry and renders judgment only after trial. The meaning is that every citizen shall hold his liberty, life, property and immunities under the protection of the general rules which govern society." *Bumguardner v. State*, 179 S.W.2d 768, 770 (Tex. Crim. App. 1944) (citation omitted).

The constitution authorizes the legislature to create a court system. Tex. Const. art. 5, § 1. The courts created include this Court and the Travis County Court at Law Number 6. *See* Tex. Gov't Code Ann. §§ 22.204, 25.2291(a)(6) (West 2004). A trial court can be presided over by an assigned judge. *See id*. §§ 74.052, .054-.056, .059 (West 2005). The constitution also created the office of county clerk, who is clerk of the county and commissioners courts and is recorder of the county. Tex. Const. art. V, § 20. The legislature delegated to the supreme court the authority and responsibility to create rules of procedure for courts of appeals. *See* Tex. Gov't Code Ann. § 22.003(b) (West 2004). One of those rules requires that litigants take actions in the trial court that preserve their ability to challenge on appeal the trial court's actions. *See* Tex. R. App. P. 33.1.

7

Ebert's filing of the documents in the clerk's office of Travis County, Texas, was an action well within the scope of the Texas Constitution, the laws and procedures established by the State of Texas, and the agencies set up to enforce those laws and the court system established to interpret those laws.

Ebert contends that the abstracts do not satisfy the elements of the offense of simulating legal process, and complains that the Travis County clerk sanctioned the document and enticed and entrapped him by accepting the documents. A person commits the offense of simulating legal process when he recklessly causes to be delivered to another any document that simulates a judgment or other court process with the intent to "(1) induce payment of a claim from another person; or (2) cause another to: (A) submit to the putative authority of the document; or (B) take any action or refrain from taking any action in response to the document, in compliance with the document, or on the basis of the document." Tex. Penal Code Ann. § 32.48(a). That section also provides:

> If it is shown on the trial of an offense under this section that the simulating document was filed with, presented to, or delivered to a clerk of a court or an employee of a clerk of a court created or established under the constitution or laws of this state, there is a rebuttable presumption that the document was delivered with the intent described by Subsection (a)."

*Id.* § 32.48(d).

Some of Ebert's complaints relate to the sufficiency of the evidence to support his convictions. In analyzing whether the evidence is legally sufficient to support the judgment, we view the evidence in the light most favorable to the judgment, asking whether any rational trier of fact

8

could have found beyond a reasonable doubt all the essential elements of the offense charged. *See Lane v. State*, 933 S.W.2d 504, 507 (Tex. Crim. App. 1996) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In a factual sufficiency review, we review all of the evidence in a neutral light. We will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met. *Garza v. State*, 213 S.W.3d 338, 344 (Tex. Crim. App. 2007).

Evidence and testimony admitted at trial supports the jury's determination that Ebert committed the offense of simulating legal process. The title and appearance of each abstract of judgment supports the jury's conclusion that the documents simulated court process. Ebert was identified as the person who delivered the abstracts of judgment to the Travis County Clerk's Office. Delivery of the abstracts to the county clerk created the statutory, rebuttable presumption that Ebert delivered the abstracts of judgment with the intent necessary to support the offense. *See* Tex. Penal Code Ann. § 32.48(d). There is no evidence in the record to the contrary. The only evidence is that Ebert sought to file the documents and that the Travis County Clerk's Office filed them. This was not entrapment. *See id.* § 8.06 (West 2003) (entrapment); *Lopez v. State*, 574 S.W.2d 563, 565 (Tex. Crim. App. 1978). As defined by statute, the crimes were complete by the time Ebert delivered the documents to the clerk. *See* Tex. Penal Code Ann. § 32.48.

The evidence and testimony admitted at trial is also factually and legally sufficient to support the jury's conclusion that Ebert made, presented or used the abstracts of judgment described above knowing that they were not records of a court created under or established by the

9

constitution or laws of this state or of the United States, but intending that the documents be given the same legal effect as a record of a court created under or established by the constitution or laws of this state or of the United States. *See id.* § 37.13. Whatever the documents may have been in the abstract, when filed in the Travis County Clerk's office, they came within the purview of the Texas Constitution, the State of Texas, and Travis County.

The penal code definitions of these offenses do not restrict behavior only of citizens of this State. They apply to a person—an individual, corporation, or association—who commits the acts forbidden without regard to whether that person is a citizen, resident, or transient noncitizen nonresident. *See id.* §§ 1.07(38), 32.48, 37.13. Ebert's delivery of these documents to the clerk's office, with the presumed intent unrebutted, meets the elements of the charged offenses, regardless of whether he chooses to spell his name with or without a hyphen, a colon, or capitalized letters and regardless of his citizenship.[4]

Ebert complains that the date file-stamped on the affidavits of non-payment (March 12, 2004) does not match the date stamped on the third page of each exhibit as the date on which the documents were filed and recorded (April 19, 2005). Without more, this apparent discrepancy has no effect on the convictions because the offenses were complete upon Ebert's creation, presentation, and delivery of the documents to the clerk's office without regard to whether or when the clerk filed them. While the discrepancy may show that the clerk's office investigated

---

[4] Ebert filed a "DECLARATION OF INDEPENDENCE BY PUBLIC NOTICE" by which he asserts that he is not responsible for an "entity" known as JAMES MARLIN EBERT. By that same declaration, he also asserts that he is not a citizen of the United States or the State of Texas.

whether the documents should be filed, it does not diminish or in any way affect the evidence that Ebert committed the offenses charged. We overrule this complaint.

Ebert contends that visiting judge Bill Bender lacked authority because Judge Bender did not provide proof that he had taken the required oath. Visiting judges must take an oath "before accepting an assignment as a visiting judge," but the statute does not specify that they must renew their oath before every assignment. *See* Tex. Gov't Code Ann. § 25.0017 (West 2004). No statute requires that judges provide proof on demand that they have taken the required oath. The clerk's record contains an oath of office for Bill Bender for the office of visiting judge attached to a notice filed by Ebert. The oath is dated May 24, 2000, and does not indicate an expiration date. Included in the reporter's record as a court's exhibit is an order assigning Judge Bender to that same court for four days effective November 6, 2006, plus whatever additional time was needed to complete the business of trials started during the appointment period. Ebert's trial began November 6, 2006. Judge Bender placed into the record the order appointing him and a card signed by the presiding judge of the Third Administrative Judicial Region of the State of Texas and reciting that "Bill Bender has been duly enrolled on the records of this region to serve as an ASSIGNED JUDGE FOR THE TEXAS JUDICIAL SYSTEM under the provisions of Ch. 74, Texas Government Code." There is no evidence in the record that Bender did not take the required oath. Accordingly, we overrule Ebert's contention on this point.

Ebert also complains that the prosecuting attorney failed to provide evidence that he was licensed or had taken the necessary oaths. Ebert has not shown that the prosecutor was required to provide such proof at trial, that the prosecutor was in fact not licensed or had not taken the

11

necessary oaths, or indeed that any absence of any oaths taken by the prosecutor harmed him by contributing to his conviction. Because he has shown no harmful error, we overrule this complaint.

Ebert challenges the documents filed to initiate and pursue his prosecution, including the complaints, affidavits for warrant of arrest and detention, informations, and amended informations. He contends these documents lack any evidence of a criminal act, a criminal thought, or a victim. He complains that the affiants lacked personal knowledge of his alleged offense. Yet personal or first-hand knowledge, while acceptable, is not required. An affidavit made before a magistrate or county attorney is called a complaint if it charges the commission of an offense. Tex. Code Crim. Proc. Ann. art. 15.04 (West 2005). A complaint need only show that "the affiant has good reason to believe, and does believe that the accused has committed such offense." *Id*. art. 15.05. A magistrate is empowered to issue a warrant of arrest "[w]hen any person shall make oath before the magistrate that another has committed some offense against the laws of the State . . . ." *Id*. art. 15.03. Much of Ebert's discussion centers on the punctuation and capitalization distinctions that, as we have discussed, do not have legal significance in this case. He also notes that the affidavits sometimes spell his middle name "Martin." This is a typographical error that does not invalidate the issuance of the warrants. *See Green v. State*, 799 S.W.2d 756, 759 (Tex. Crim. App. 1990). Each affidavit plainly describes the actions complained of, lists the name of the offense, a culpable mental state, and a victim. There is no evidence that the affiants and the drafters of the complaints did not have good reason to believe or did not believe that Ebert committed the offenses described in the affidavits. In authorizing the issuance of an arrest warrant, the magistrate did not assert personal knowledge of the alleged actions, only that the sworn assertions in the affidavits

12

provided probable cause for issuance of an arrest warrant. We overrule Ebert's asserted errors relating to these documents.

Other assertions of error are likewise meritless. Ebert complains of the denial of his request for a bill of particulars. Texas law does not provide for a bill of particulars. *See State v. Houth*, 845 S.W.2d 853, 861 n.6 (Tex. Crim. App. 1992). Further, Ebert does not show how the information did not apprise him of the crime charged sufficiently to let him prepare a defense. Ebert objects to the admission of his driver's license as hearsay. However, he fails to allege and does not demonstrate any harm from the admission of his driver's license into evidence. Ebert complains that he was not allowed to confront his accuser because he was not able to "identify the alleged THE STATE OF TEXAS" and because he was not allowed to bring forth witnesses, in part because the court quashed some subpoenas, and in part because he could not decipher the signature of the person who signed the complaint. A criminal defendant has the right to secure the attendance and testimony of witnesses whose testimony would be both material and favorable to the defense. *Coleman v. State*, 966 S.W.2d 525, 527-28 (Tex. Crim. App. 1998) (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 866-67 (1982)). Not only is the State of Texas not a corporeal person, Ebert did not show that any representative of the State had material and favorable testimony to give. The same is true of the corporeal witnesses for whom his subpoenas were quashed, including Travis County Attorney David Albert Escamilla, Travis County Judge Samuel T. Biscoe, and Dolores Ortega-Carter of the Travis County Treaurer's Office. There is no showing of error on the part of the trial court in Ebert's inability to read the affiant's signature or otherwise learn that person's identity. We overrule these assertions of error.

Ebert alleges that a gap exists in the reporter's record before the beginning of the transcribed portion that begins with preliminary activities like the taking of a plea. Ebert alleges that the gap includes his oral request that Judge Bender recuse himself due to "prior judicial involvement with the man" as well as comments Ebert asserts showed a bias against him. The existence of the alleged gap, by itself, does not demonstrate error. The clerk's record does not contain a written objection to Judge Bender's assignment or motion to recuse him as some courts have held is required, even when the judge's assignment is unexpected. *See Morris v. Short*, 902 S.W.2d 566, 569 (Tex. App.—Houston [1st Dist.] 1995, writ denied); *Money v. Jones*, 766 S.W.2d 307, 308 (Tex. App.—Dallas 1989, writ denied). Ebert does not specify anything that occurred during the allegedly missing sections of the record that prevented him from defending himself. He contends that he was told during off-the-record conferences "to go quicker." This contention does not illustrate a bias or show how that direction contributed to Ebert's conviction. He does not point to anything in the existing record that illustrates how the alleged bias manifested itself in ways that hindered his defense. Ebert does not show that the allegedly missing portions of the record are necessary to the resolution of the appeal. *See* Tex. R. App. P. 34.6(f); *Issac v. State*, 989 S.W.2d 754, 757 (Tex. Crim. App. 1999); *Doubrava v. State*, 28 S.W.3d 148, 150 (Tex. App.—Eastland 2000, pet. ref'd).

Ebert asserts that, although he waived the right to be represented by an attorney, he did not waive the right to effective counsel. If Ebert is contending that he had the right to be represented by someone other than a licensed attorney, he is incorrect. Neither the United States Constitution nor the Texas Constitution create a right to representation by someone not licensed to

14

practice law. *See United States v. Grismore*, 546 F.2d 844, 847 (10th Cir. 1976); *Coyle v. State*, 775 S.W.2d 843, 845-46 (Tex. App.—Dallas 1989, no pet.); *see also* Tex. Gov't Code Ann. §§ 81.101-.102 (West 2005). As he waived the right to be assisted by a licensed attorney, he was not deprived of his right to effective assistance of counsel by anyone other than himself. His choice of self-representation is not grounds for reversal.

Ebert asserts that the flag in the courtroom had fringe on it, which he states indicated to him that the court was a military court, an admiralty court, a foreign jurisdiction, and an unlawfully erected state within a state. We find no legal or factual basis for these allegations. Ebert cites an executive order from President Eisenhower and asserts that the order states that a military flag of the United States has fringe on it. Exec. Order No. 10,834, 3 C.F.R. 367 (1959-1963), 24 Fed. Reg. 6865 (Aug. 21, 1959), *reprinted in* 4 U.S.C.A. § 1 (2005). The order describes the design and dimensions of the United States flag upon the admission of Hawaii as a state—the national flag that is in use today. *See id*. The order also sets out provisions for procurement of flags by the military and by executive agencies. *Id*. The executive order does not mention fringe, restrict the use of fringe on flags, or ascribe a particular symbolic or legal ramification or implication of the use of fringe on flags. *See id*. When asked for an opinion regarding the propriety of the use of fringe on flags used by the military, the United States Attorney General in 1925 opined that the statutes were silent as to whether fringe could be affixed to the United States flag, and that the president had the authority as commander-in-chief to determine whether it could legally be affixed to flags flown by the army and navy. 34 Op. Att'y Gen. 483; 1925 U.S. AG LEXIS 29, at *5 (1925). The attorney general quoted the adjutant general of the army as stating, "In flag manufacture a fringe is not

15

considered to be a part of the flag, and it is without heraldic significance." *Id*. at *4. The attorney general also wrote:

> The fringe does not appear to be regarded as an integral part of the flag, and its presence can not be said to constitute an unauthorized addition to the design prescribed by statute. An external fringe is to be distinguished from letters, words, or emblematic designs printed or superimposed upon the body of the flag itself. Under the law such additions might be open to objection as unauthorized; but the same is not necessarily true of the fringe.

*Id*. at *4-*5. A declaration that the president may authorize or allow the military to attach fringe to its flags is not the same as a declaration that any flag that is fringed is a military or admiralty flag or that the presence of fringe alters the law applied by a court in which a fringed flag appears.

Courts have rejected drawing any legal significance from fringe on flags displayed in the courtroom. One court described an allegation that a court lacked jurisdiction because its flag had fringe on it as "totally frivolous." *Vella v. McCammon*, 671 F. Supp. 1128, 1129 (S.D. Tex. 1987). Another described a claim that the gold fringe on the flag in the courtroom conferred admiralty or maritime jurisdiction as "preposterous." *Pennsylvania v. Appel*, 652 A.2d 341, 343 (Pa. Super. 1994). We also find such a claim without merit.

Regardless of any fringe or other adornments on the flag displayed in the courtroom, there is no showing that the trial court used military or maritime laws or rules of procedure. The only indications in the record are that Ebert was charged under the laws of the State of Texas and that the court conducted the trial under the laws and rules of procedure promulgated by the legislature and supreme court of the State of Texas consistent with the constitution of the State of Texas and of the United States of America.

16

Ebert contends that he was deprived of due process because he asserts that when he asked "am I going to have an informed jury?" he heard the judge respond, "No." The court reporter transcribed the judge's response as "Now." There is no indication that Ebert sought a correction of that transcription. *See* Tex. R. App. P. 34.6(e). Further, the exchange occurred in the context of a discussion that led to the court granting the State's motion in limine to prevent Ebert from telling the jury that their verdict could be less than unanimous. Texas law requires that each juror in a criminal case in county court concur in the verdict. Tex. Code Crim. Proc. Ann. art. 37.03 (West 2006). We find no deprivation of due process in the trial court preventing a party from misinforming the jury regarding the law.

Ebert contends that the trial court lost jurisdiction by "intentionally violating the Texas Rules of Court and the Right of James-Marlin Ebert to a competent, lawful, fair and unbiased trial Judge" and by violating his right to due process by removing the jury numerous times during the trial in order to conduct hearings on legal matters outside of the jury's presence. We find no support for the proposition that a court can lose jurisdiction by showing bias or conducting hearings on legal matters outside the jury's presence. Further, we find no bias evident in the instances listed by Ebert in his brief.[5] Ebert asserts that the trial court showed bias in an exclamation,[6] in its attempt

---

[5] Ebert states in his brief that the passages he cites are "Not complete, served as examples" of instances of bias. The briefing rules require that parties make "appropriate citations to authorities and to the record." Tex. R. App. P. 38.1(h). Error is waived as to any passage not cited as containing error because appellate courts are not required to search the record to find error for the appellant. *See Lawton v. State*, 913 S.W.2d 542, 554 (Tex. Crim. App. 1995). We nevertheless have read the record and do not find that the trial court exhibited bias against Ebert.

[6] When addressing pretrial motions before voir dire, the trial court said, "What in the heck are we doing now?"

to obtain the list of venire members Ebert wanted struck from the jury panel,[7] in trying to get Ebert

to enter a plea as required by statute (*see* Tex. Code Crim. Proc. Ann. art. 27.16(a) (West 2006)),[8]

---

[7] After the examination of the jury panel ended, the trial court, Ebert, and the assistant district attorney, William G. Swaim, had the following exchange:

MR. EBERT:  How many do I get?
THE COURT: You don't know?
MR. EBERT:  That's why I'm asking.
THE COURT: Uh-huh.  You know.
MR. EBERT: I may—I may know.  I'm asking whether you know.
THE COURT: I know.  I know what you're doing.
     Okay.  All right.  Give the clerk your strike lists.  Now, don't run off.
MR. SWAIM:  Your honor, it appears the Defendant struck more than three people
     on his list.
THE COURT: All right.  I'm going to tell you, you only get three.
MR. EBERT: Okay.  You can pick any three.
THE COURT: No. You decide which three you want to pick.
MR. EBERT: Okay.
THE COURT: Thank you.  I didn't—I wasn't looking at it.
MR. EBERT: Does that satisfy?
THE COURT:  What does this say?  Oh, you crossed—the ones you crossed out you don't
     want to strike?
MR. EBERT: Those are the ones I want struck.
THE COURT: You want struck.  You got Number 2; is that correct?
MR. EBERT: That's correct.
THE COURT: You making a record of this?

[8] After the jury was seated and Ebert offered documents challenging the authority of the prosecutor and the court sustained the State's objection to the documents, the court tried to take a plea. Ebert declined to plead to a "hearsay information." The trial court excused the jury, and the following exchange occurred:

MR. EBERT:  Now, this one is—falls under Texas Rules of Evidence, I think, 902
     where it's a certified copy of a public record, which goes to show
     that I am not represented by anyone.  Therefore—
THE COURT: You waived representation, didn't you?
MR. BERT: No, I did not.
THE COURT: You waived an attorney?
MR EBERT: I—I waived an attorney.
THE COURT: That's right.  That's representation.

18

MR. EBERT: No, it's an attorney.

THE COURT: What's your objection?

MR. EBERT: That he's making claims and speaking for me, and you are making an attempt to put in a plea for me.

THE COURT: Oh, no, sir. All I'm asking for you to do is to enter a plea. Do you plead guilty, no contest, okay, or not guilty?

MR. EBERT: So far I have not put anything in this court to give it jurisdiction in terms of a justiciable matter. In other words, there's no argument. I have not been presented anything with—I have not been able to discover whether or not there's enough information to make a plea one way or the other. I'm hoping this man will give me that information, and then, at that moment in time, I can offer a plea possibly.

THE COURT: You know what you're charged with by the information. And to that information that just was read into the record, I'm asking you how—what is your plea?

MR. EBERT: But was that information sworn?

THE COURT: Yes, sir.

MR. EBERT: Excuse me?

THE COURT: Uh-huh.

MR. EBERT: No, I'm asking you, is the information—

THE COURT: Yeah, it is—it is—it's sworn to. Yes, sir. Yes, sir. Uh-huh. Uh-huh.

MR. EBERT: Oh, I beg to differ with you on that.

THE COURT: Look—look at what's—forms the basis of it.

MR. EBERT: Yeah, okay. Oh, oh, now, there you go. You just opened it up. I would encourage you to—

THE COURT: I'm not going to argue with you, sir. I'm over—I'm—all I'm asking you to do—if you don't want to enter a plea, okay, I'm not going to force you to do anything, okay?

MR. EBERT: Thank you.

THE COURT: You see? Okay.

MR. EBERT: I'm with you.

THE COURT: Thank you. All right. Sit down.

MR. EBERT: But I—I am going to hold you to what you said, the basis. And I would like you to look into each one of these folders and look at the basis—

THE COURT: Sir—sir—sir—look, this is standard procedure where the information is read and the Defendant enters a plea—

MR. EBERT: Okay. It's standard.

THE COURT: —okay?

MR. EBERT: But that doesn't mean anything to me—

and in refusing to give jurors a document that Ebert believed they should see immediately.[9]  The

alleged instances of bias show, at most, some frustration by the presiding judge with Ebert's

> THE COURT: I know it doesn't to you, okay?  But it does to me—
> MR. EBERT:  Well, I appreciate that.
> THE COURT:  —okay? And it will to the Court of Appeals, okay? Go ahead.  Sit
> down.
> MR. EBERT: You have taken notice of this.
> MR. SWAIM: Objection; Your Honor.  This—
> THE COURT: Sustained.
> MR. EBERT: Excuse me.  He hadn't even stated his objection yet.
> THE COURT: I think he previously stated his objection, and you didn't listen.
> MR. EBERT: And how can you object to—to putting something in public record?
> THE COURT:  I'm not going to argue with you, Mr. Ebert.  Please.  This makes no
> sense.
> MR. EBERT: Okay.  I don't agree and I don't consent.

Shortly thereafter the following exchange occurred:

> MR. EBERT: Excuse me.  You're on notice not to enter a plea.
> THE COURT: By you.
> MR. EBERT: By public record.
> THE COURT:  If I understand it correctly, if you've refused to enter a plea, the
> Court will do it for you.
> MR. EBERT: Well, that's what he's saying to you, yes.
> THE COURT: Okay.
> MR. EBERT: That's what he's saying.
> THE COURT:  Well, we'll see what happens, okay?  I'm entering a plea of not
> guilty.
> Let's bring the jury back in.
> MR. EBERT: I object.
> THE COURT: Thank you, sir.

[9] Ebert cites the following exchange as showing bias:

> MR. EBERT: I would move that the jurors be given a copy of each one of those.
> THE COURT: They will be, in time.  Okay.
> MR. EBERT: Excuse me.  I think they would enjoy having one now.
> THE COURT: Sir, please.  I made a ruling, okay?

The record is not clear what the document is.

resistance to standard court proceedings.  We find no evidence of bias that affected the outcome of the trial.  *See Watson v. State*, 176 S.W.3d 413,418 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (irritation with defendant in role as self-representative not fundamental error).  Many of the more pointed exchanges occurred outside the presence of the jury, thus blunting any possible prejudicial effect on the jury from hearing the exchanges.  Ebert also cites as error instances in which the trial court removed the jury during a discussion of the requirement that a visiting judge take required oaths, a discussion of whether a defendant is required to enter a plea, a discussion of who defendant intended to call as witnesses and why his subpoenas of some desired witnesses had been quashed, and the discussions of the jury charge.  The jury's removal during such discussions is consistent with the rules of evidence.  *See* Tex. R. Evid. 104(c).  We overrule these asserted errors.

Ebert also contends that the prosecutor argued improperly to the jury by injecting personal beliefs, seeking to inflame juror emotions, and implying that the jury's decision could help solve a social problem.  Ebert cites segments of argument in which the prosecutor described the nature of Ebert's documents as not "original with him" and Ebert's theories regarding the effect of capitalization as "crazy."  Ebert also cites the prosecutor's statement, "I'll argue to you what I think an appropriate sentence would be," as well as a large segment that the prosecutor began by calling Ebert an obstructionist, then encouraged the jury to send a message "[n]ot just to Mr. Ebert, but to those people who support him—other people are here, listening—that this kind of behavior will not be tolerated."  Ebert did not object when any of these statements were made.  After argument concluded, he objected to the prosecutor's assertion that Ebert should have tried to settle the case.  The court of criminal appeals has held that "a defendant's failure to object to a jury argument or a

21

defendant's failure to pursue to an adverse ruling his objection to a jury argument forfeits his right to complain about the argument on appeal." *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). Ebert's objection was not timely with respect to the earlier arguments by the prosecutor. Further, he did not object at trial to the portions of the argument about which he complains on appeal. Ebert did not preserve the errors he asserts on appeal. *See* Tex. R. App. P. 33.1(a).

Ebert also contends that the court erred by holding him in contempt and sentencing him without a hearing. Direct contempt that is witnessed by the judge may be summarily punished without further proof because the judge has observed the contemptuous actions. *In re Oliver*, 333 U.S. 257, 274-75 (1948); *Ex Parte Daniels*, 722 S.W.2d 707, 709 (Tex. Crim. App. 1987). The court held Ebert in contempt for leaving the courtroom during sentencing despite the court's direction that he "come forward." No hearing was needed, no right to due process was violated, and no error was committed.

Ebert argues that the trial court erred by incarcerating him because he did not consent to incarceration. States may not deprive an individual of liberty without due process. *See* U.S. Const. amend XIV, § 1; *see also* Tex. Const. art. 1, § 19. Although he was undisputedly deprived of his liberty, we have found no valid assertion of a deprivation of due process. Incarceration following a conviction is almost always without consent. We find no basis for reversal.

Ebert contends that the trial court lost subject matter jurisdiction of this case when it misled him concerning his right to appeal or his right to announce appeal. We find nothing in the record showing that Ebert was misled as to his right to appeal. As Ebert's appeal is before us on its merits, nothing the trial court did or failed to do prevented Ebert from appealing. We find no error.

22

Finding no error on the part of the trial court that merits reversal of Ebert's convictions, we affirm.

_____

G. Alan Waldrop, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed:   July 27, 2007

Do Not Publish